DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Defendant-Appellant, Richard Murphy, appeals his convictions for gross sexual imposition and use of a minor in nudity-oriented material or performance. We affirm.
 {¶ 2} In 2005, the mother of fourteen-year-old M.A. discovered an unsent letter in which M.A. confided that she had been sexually abused by Defendant when she was between the ages of eight and eleven years. Defendant had been a frequent babysitter for M.A. and her younger sister after school and overnight on weekends during that period of time. *Page 2 
 {¶ 3} On May 22, 2006, Defendant was indicted on the following charges: (1) rape involving sexual conduct with a minor under the age of thirteen, a violation of R.C. 2907.02(A)(1)(b); (2) gross sexual imposition involving contact with a minor under the age of thirteen, a violation of R.C. 2907.05(A)(4); (3) pandering obscenity involving a minor, a violation of R.C. 2907.321(A)(1); and (4) illegal use of a minor in nudity-oriented material or performance, a violation of R.C.2907.323(A)(1). Defendant pled not guilty to the charges. The trial court dismissed the charge of pandering obscenity involving a minor prior to trial, and the matter proceeded to jury trial on August 24, 2006. The trial court declared a mistrial during the state's presentation of evidence, and a second trial commenced.
 {¶ 4} With respect to the charge of rape, the jury reached an impasse, and the trial court declared the panel hung. Defendant was found guilty of the remaining charges of gross sexual imposition and use of a minor in nudity-oriented material or performance. On October 3, 2006, the trial court sentenced him to prison terms of three and four years, respectively, and adjudicated Defendant to be a sexually oriented offender/child victim offender for purposes of R.C. Chapter 2950. This appeal followed.
 ASSIGNMENT OF ERROR I "The trial court committed reversible error when it denied [Defendant's] motion for judgment of acquittal under Crim.R. 29." *Page 3 
 ASSIGNMENT OF ERROR II "[Defendant's] conviction was against the manifest weight of the evidence and the jury lost its way."
 {¶ 5} In his two assignments of error, Defendant maintains that the State produced insufficient evidence to support his convictions and that his convictions are against the manifest weight of the evidence. Specifically, Defendant argues that the evidence was insufficient to establish the elements of gross sexual imposition because the State did not introduce corroborating evidence other than the testimony of M.A. and Defendant's confession. He argues that the evidence was insufficient to establish the elements of illegal use of a minor in nudity-oriented material or performance because the State's evidence consisted only of M.A.'s testimony regarding the incident in which the photograph was taken, while the photograph itself was never located. In addition, Defendant maintains that his convictions were against the manifest weight of the evidence because M.A.'s testimony contained inconsistencies and lacked corroboration and because his own confession was prompted by the interviewing detective.
 {¶ 6} When reviewing the trial court's denial of a Crim.R. 29 motion, this court assesses the sufficiency of the evidence "to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In making this determination, we must view the evidence in the light most favorable to the prosecution. Id.; State v. Feliciano (1996), *Page 4 115 Ohio App.3d 646, 652. "In essence, sufficiency is a test of adequacy."State v. Thompkins, 78 Ohio St.3d 380, 386.
 {¶ 7} "While the test for sufficiency requires a determination of whether the [S]tate has met its burden of production at trial, a manifest weight challenge questions whether the [S]tate has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 8} Defendant was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4), which prohibits sexual contact with another when "the other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). *Page 5 
 {¶ 9} Defendant was also convicted of illegal use of a minor in nudity-oriented material or performance in violation of R.C.2907.323(A)(1), which provides that "[n]o person shall * * * [p]hotograph any minor who is not the person's child or ward in a state of nudity, or create, direct, produce, or transfer any material or performance that shows the minor in a state of nudity[.]" The statute thus prohibits the action of photographing a minor in a state of nudity, a crime that may be established without admission of the photograph itself into evidence. "The statute does not require that the state produce the actual photograph in order to support a conviction. Rather, the statute merely prohibits a person from photographing a minor in a state of nudity."State v. Merritt, 5th Dist. No. 06CA10, 2007-Ohio-480, at ¶ 40.
 {¶ 10} Because sufficient evidence is required to take a case to the jury, the conclusion that a conviction is supported by the weight of the evidence necessarily includes a finding of sufficiency. State v.Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2. "Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Id. This case is not the rare instance in which the weight of the evidence warrants a new trial, and so resolution of Defendant's second assignment of error is dispositive of his first as well.
 {¶ 11} At trial, M.A. testified that Defendant and his wife provided childcare to her and her younger sister before and after school during the week and *Page 6 
on weekends from the time she was seven or eight years old until age eleven. During that period of time, according to M.A., her mother worked as a truck driver and her father, who was unemployed, was frequently intoxicated and unable to care for the children. Defendant required the girls to change into clothing that he provided for them before going to school — clothing consisting of "baggy clothes that were too big * * * and too long" — because Defendant considered their own clothing to be inappropriate and provocative.
 {¶ 12} According to M.A., Defendant was "very nice" to the girls, giving them gifts and taking them on various outings. As time progressed, she recalled, her sister and Defendant's wife stayed at home while she and Defendant were alone together. M.A. testified that Defendant asked the girls to kiss him before they left for school, but that while her sister was permitted to kiss Defendant on the cheek, M.A. was to kiss him on the mouth. She recalled that the kissing became increasingly intimate in nature: "at first it was just a peck, and then it was more intimate * * * kissing with [the] tongue."
 {¶ 13} On weekends, the girls frequently spent Saturday night at Defendant's home. M.A. testified that her sister slept on a couch on the first floor of Defendant's home while Defendant required her to sleep upstairs in a guest bedroom because, according to him, she was "too tall" for the couch. M.A. and Defendant frequently watched videos in the upstairs bedroom where, she recalled, he began to "touch [her] in places * * * on [her] breast and between [her] legs." *Page 7 
M.A. testified that Defendant placed his finger in her vagina "many times." According to M.A., Defendant asked her to sleep with him on a daily basis until, finally, he came into the guest room during the night, removed her clothing, and raped her.
 {¶ 14} M.A. recalled that, on one occasion, Defendant came into her room with a camera:
 "Q: Did [Defendant] ever take a photograph of you, [M.A.]?
 "A: Yes, he did.
 "Q: Would you tell the jury about that?
 "A: One night [Defendant] walked into my bedroom, and he had a camera with him, and he undressed me, and laid me on the bed with my arms and legs spread, and he told me to stay still, and he took about three or four pictures.
 "Q: What type of camera was this?
 "A: I'm pretty sure it was a Polaroid because the pictures came right out.
 "Q: You said that — did he take your clothes off?
 "A: Yes, he did.
 "Q: And so you had no clothes on?
 * * *
 "A: Yes.
 "Q: And how did he ask you to place yourself on the bed?
 "A: He placed me. I didn't move, I was too scared to move. *Page 8 
 "Q: So what did he do? How did he lay you out?
 "A: My arms and legs were spread.
 "Q: Okay. So — I have to ask you this * * * your vagina could be seen?
 "A: Yes.
 * * *
 "Q: And did the camera, did it have a flash on it or no flash?
 "A: It had a flash on it.
 "Q: And what did he do after he took the photographs?
 "A: He put the photos in his pocket, his shirt pocket, and he left my room, and I got dressed."
 {¶ 15} M.A. admitted that she did not tell anyone about the abuse for two years, and explained that her silence was motivated by fear: "I was — I was too scared to. I thought it was my fault. * * * Because I didn't know how to stop him from doing it[.]" She also acknowledged inconsistency between her testimony and prior statements made in the course of medical treatment, attributing the inconsistency to stress. She maintained, however, that although she "said some things that are a little bit different * * * it is all true."
 {¶ 16} Amanda Leaver, a social worker employed by the C.A.R.E. Center at Akron Children's Hospital, testified that she interviewed M.A. prior to a physical examination by C.A.R.E. Center staff on November 11, 2005. Ms. Leaver recalled the substance of the interview in terms that proved largely consistent with M.A.'s subsequent testimony. Specifically, Ms. Leaver testified *Page 9 
that M.A. described the babysitting arrangement between her family and Defendant; the sleeping arrangements for her and her sister in Defendant's home; the first incident of alleged rape; and that Defendant "touched her breast and vagina with his fingers." Ms. Leaver also stated that M.A. described an incident in which Defendant "came into the room, and he had her take all of her clothes off, and he took pictures of her spread eagle on the bed." With respect to delayed reporting of abuse, Ms. Leaver observed that child victims often wait for long periods of time before telling anyone what happened. She noted that the delay is frequently occasioned by embarrassment or fear.
 {¶ 17} Dana Little, a forensically-trained social worker employed by the Summit County Children's Services Board, testified that she met with M.A. on October 12, 2005, as a referral follow-up. Ms. Little recalled that M.A. described Defendant's actions in detail, without hesitancy, although "[i]t was not easy for her to talk about." According to Ms. Little, M.A. identified Defendant, described the time period during which the abuse occurred, and provided details that were consistent with later statements.
 {¶ 18} Donna Abbott, an experienced nurse practitioner employed by Akron Children's Hospital, examined M.A. shortly after the child's interview with Ms. Little. Ms. Abbott explained that the standard procedure for such examinations includes a meeting with the responsible adult followed by an interview of the child victim and a physical examination, during which she notes *Page 10 
any observable physical abnormalities or symptoms and performs testing for sexually transmitted diseases.
 {¶ 19} According to Ms. Abbott, the fact that M.A. remained silent about the abuse for several years was not unusual. She testified that most children report sexual abuse "weeks, months, years" after the abuse occurred, and explained that she does not expect to find physical evidence of sexual abuse in most cases, even if reported within days of the event:
 "[T]here can be injuries, minor tears or cuts or bruises, and as I said before, those are going to heal within two or three days. So certainly even a week or a month after it happened, especially years, we don't expect to see any type of damage."
Ms. Abbott emphasized that in between eighty and ninety percent of similar cases, she would expect "no physical finding" of injury.
 {¶ 20} Sergeant Kenneth Butler of the Akron Police Department testified regarding his interview with Defendant on April 24, 2006. Sergeant Butler recalled that Defendant came to the police station voluntarily and was not in custody during his interview. Although Sergeant Butler conceded on cross-examination that Defendant initially denied having any inappropriate contact with M.A., he emphasized that Defendant admitted during the course of the interview that he penetrated M.A. digitally and photographed her in the nude. Sergeant Butler testified that Defendant described his conduct with M.A. "very precisely," but refused to accept any responsibility for his actions. Sergeant Butler recalled *Page 11 
that Defendant emphatically denied having intercourse with then pre-teenaged M.A. because, according to Defendant, "she [was] not his type — she is fat."
 {¶ 21} Sergeant Butler testified that he asked Defendant whether he would like to write a letter of apology to M.A. at the close of the interview. According to Sergeant Butler, the dual purposes of such a letter are to provide the interviewee with an "outlet" or "[a] chance to tell the victim you are sorry, if that's what you would like to do" and, for purposes of the criminal investigation, to commit the subject of the interview to writing. Sergeant Butler recalled that Defendant desired to write a letter of apology, but filled the first several pages with vague regrets and religious sentiments.
 {¶ 22} At Sergeant Butler's urging, Defendant's letter — which was admitted at trial as State's Exhibit 7 — became more specific. In it, he acknowledged that he had sexual contact with M.A. He also admitted the existence of the photograph, writing, "Sorry about the picture also. I promise you I never let anyone else see it and I even forgot about wherever I put it. * * * [T]aking your picture was wrong." Throughout the letter, however, Defendant blamed M.A. for provoking his actions and acting out things that she "fantasied" [sic] or imagined and portrayed himself as a weak-willed, but unwilling, participant.
 {¶ 23} Defendant's arguments regarding the weight of the evidence at trial relate to the jury's assessment of the credibility and resolution of conflicts in *Page 12 
M.A.'s statements. With respect to this testimony, however, "the jury [was] free to believe, all, part, or none of the testimony of each witness." State v. Griffin, 9th Dist. No. 23459, 2007-Ohio-1944, at ¶ 9, quoting Price v. Jordan, 9th Dist. No. 04CA008423, 2004-Ohio-7184, at ¶ 35. This court may reverse a conviction and order a new trial only in the exceptional case where the evidence weighs heavily in favor of the defendant. Otten, 33 Ohio App.3d at 340. This is not such a case. Accordingly, Defendant's contentions that his convictions were against the manifest weight of the evidence and supported by insufficient evidence are without merit.
 {¶ 24} Defendant's assignments of error are overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of *Page 13 
Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
 WHITMORE, J., MOORE, J., CONCUR *Page 1