[Cite as *State v. Sanchez-Sanchez*, 2022-Ohio-4080.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                         No. 110885

    v.                                :

ELDER SANCHEZ-SANCHEZ,                   :

    Defendant-Appellant.        :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, VACATED IN PART
                 AND REMANDED
**RELEASED AND JOURNALIZED:**  November 17, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-648576-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl J. Mazzone, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Aaron T. Baker, Assistant Public Defender, *for appellant*.

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Elder Sanchez-Sanchez ("Sanchez") appeals his convictions from the Cuyahoga County Court of Common Pleas. A jury found Sanchez guilty of rape, gross sexual imposition and illegal use of a minor in nudity-

oriented material or performance. Sanchez argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, that his trial counsel was ineffective, that the trial court was biased against him and that the trial court erred in permitting certain testimony and issuing a jury instruction on flight as consciousness of guilt.

{¶ 2} For the reasons that follow, we find that there was insufficient evidence presented to sustain a conviction for illegal use of a minor in nudity-oriented material and we, therefore, vacate that conviction. We affirm Sanchez's other convictions, although we find that the trial court erred in issuing a flight instruction.

## I.    Factual and Procedural Background

{¶ 3} On March 10, 2020, a Cuyahoga County Grand Jury returned an indictment charging Sanchez with rape through digital penetration (Count 1), gross sexual imposition through "touch[ing] breasts" and "tongue kiss[ing]" (Counts 2–3) and illegal use of a minor in nudity-oriented material or performance (Count 4). The rape count contained a "furthermore clause" specifying that the alleged victim was between 10 and 13 years old and Sanchez compelled her to submit by force or threat of force. The crimes were alleged to have taken place between on or about June 1, 2019, and November 10, 2019. The charges all relate to the same minor female — J.T. — who was 11 and 12 years old during the time covered by the indictment.

{¶ 4} After lengthy pretrial proceedings, a trial on the charges began on August 10, 2021.

**A. Voir Dire**

**1. The Trial Court's Removal of Juror No. 18**

{¶ 5} Outside of the jury panel's presence, the lead prosecutor informed the court that his co-counsel told him one of the prospective jurors — juror No. 18 — "was making heavy signs and making comments to the side that would indicate she doesn't want to be here" each time the prosecutor asked a question or moved on to another prospective juror. The prosecutor stated that he raised the issue because he intended to question the prospective juror about these observations.

{¶ 6} The prosecutor's co-counsel described what she witnessed as follows:

Your Honor, I heard her yawning and saying — every time [the prosecutor conducting voir dire] would ask another question, she would say this is crazy, oh, this is crazy. The way she was saying it was as if she was sick of being here and sick of him questioning jurors.

{¶ 7} The court asked defense counsel for comment and counsel responded, "I mean I guess we can get to her when we get to her * * *."

{¶ 8} The court then told the parties the following:

Quite frankly, in my 40 some years of practice in trial litigation, when we had a juror like that, what I normally had done, and what I learned from other judges, was we would wait until the end and we'll excuse them for cause from the court, and just make her go through the whole day anyway and then she doesn't get paid either. * * * I am not sending her home at 9:30 [a.m.] That's like a gift.

{¶ 9} The prosecutor then stated that he was not asking for juror No. 18 to be removed yet and defense counsel said, "I want to see. * * * Let's get to the bottom of it now rather than later."

{¶ 10} The court instructed counsel to "[t]alk to her now so she's quiet. If I forget, you remind me, I am going to remove her for cause if she ever gets up to there, you know what I mean, because a juror with that kind of attitude is not going to be a juror that would participate in the deliberations in the proper open-minded situation."

{¶ 11} The court called juror No. 18 into the courtroom and the court, prosecution and defense questioned her about the allegations. Juror No. 18 admitted that she and a couple other prospective jurors were talking before the lunch break about how hungry they were and about when they would be permitted to go to lunch. Juror No. 18 denied sighing heavily, making comments and talking with any prospective jurors about the prosecution's voir dire questions. She testified that whatever comments she may have made do not relate to the merits of the case; they were just talking about food.

{¶ 12} The court then called juror No. 17 and juror No. 19 into the courtroom — the prospective jurors whom juror No. 18 reported were talking about lunch.

{¶ 13} Juror No. 17 similarly denied that there was heavy sighing or comments along the lines of "this is crazy" and "come on" in response to voir dire questioning. Juror No. 17 recalled "some people prior to lunch getting hungry because the time had ran over." Juror No. 17 did not recall any comments or gestures about anything going on with the voir dire itself, and she did not recall if she made an audible sigh. She reported that she had no feelings about sitting through the voir dire process and had no reservations about sitting on a jury.

{¶ 14} Juror No. 19 also testified that she did not recall any prospective juror making audible noises or comments regarding the voir dire.

{¶ 15} The parties' use of peremptory challenges brought juror No. 18 into the prospective petit jury.[1] The state asked her how she felt when she heard the charges read, and she testified that she was excited to be there and "to know that I have a chance to come into court and present myself on a case."

{¶ 16} After the parties' inquiry of juror No. 18 was complete, the court called counsel up to a side bar, noted that the parties were out of peremptory challenges and asked what the parties wanted to do with juror No. 18. The state asked that she be removed for cause, stating as follows:

> I feel that her tenor and demeanor are stark contrast to what they are now. She feels almost over eager to serve on the jury. I believe it's making up for what she heard from us this morning. I have no reason to disbelieve what [my co-counsel] disclosed to me during the course of my voir dire the other day. At this time I don't know that she's an appropriate juror for this case.

{¶ 17} Defense counsel objected to removing the prospective juror for cause, arguing that juror No. 18 reported no bias for or against any party and that she did not make any disqualifying comments during voir dire. Counsel noted that the jurors they questioned had been consistent with each other and denied hearing anything; what little they reported saying "didn't involve much." Counsel also did not agree that juror No. 18 seemed overly eager and he argued that, even if she was, that would not be a basis for removing her for cause.

---

[1] Juror No. 18 was renumbered as juror No. 10 when she was brought into the prospective petit jury. For consistency, we continue to refer to her as juror No. 18.

{¶ 18} The court stated that it did not find juror No. 18 credible when answering questions earlier in the day about the allegations of making audible sighs and, further, was bothered "that she said she was excited by hearing the indictment." Defense counsel stated that he understood juror No. 18 to mean that she was excited to be a part of the process itself, not that she was excited by the nature of the allegations. The prosecutor stated that he believed juror No. 18 was not being honest "from the start."

{¶ 19} The court noted the defense's objection and removed juror No. 18 for cause, reasoning:

> Well, I'll say that the reason I announced that I would remove her for cause this morning is because I found her to be totally lacking credibility to those questions that were asked of her this morning. I think I have to stand by my ruling. * * * I did announce it to both of you. * * * I even considered maybe not even calling her up except I chose to call her up solely to not embarrass her in front of the rest of the jurors because we had not done that with anyone else. That's the sole reason I let her take the seat.

### 2. Defense Counsel's Discussion of Sanchez's Immigration Status

{¶ 20} Defense counsel, while questioning the venire, engaged in the following line of questioning:

> [DEFENSE COUNSEL]: [I]llegal immigration has been a hot topic for the last few years. I think the judge touched on it. Would you agree?
>
> JUROR NO. 14: Yes.
>
> [DEFENSE COUNSEL]: You will hear rhetoric basically saying that all illegal immigrants are rapists, drug dealers or murderers?
>
> JUROR NO. 14: Yes.

[DEFENSE COUNSEL]: You have heard it?

JUROR NO. 14: Yes.

[DEFENSE COUNSEL]: I am not saying you would agree with it?

JUROR NO. 14: Right.

[DEFENSE COUNSEL]: Some people do believe that. Do you believe that?

JUROR NO. 14: I do not believe that.

[DEFENSE COUNSEL]: Does anyone hear [sic] on the panel believe that? You are going to hear that Elder Sanchez-Sanchez is illegally here. We're not going to hide that fact. Does anyone on this panel believe that that will affect their ability to decide whether my client is guilty or not guilty?

{¶ 21} No prospective juror reported that Sanchez's lack of legal immigration status would affect their ability to decide guilt or innocence. After a peremptory challenge brought a new prospective juror into the jury box, defense counsel asked the new venireperson if they would hold Sanchez's presence in the country without legal status against him. The prospective juror answered that he would not. The state also repeated the line of questioning with another prospective juror who came to the jury box as a result of peremptory challenges:

[PROSECUTOR]: You heard Mr. Rodriguez state that his client is here illegally, correct?

JUROR NO. 4: Yes.

[PROSECUTOR]: How do you feel about that?

JUROR NO. 4: I have no animosity toward that situation.

[PROSECUTOR]: So you won't feel bad for him because he is not here legally and that the system itself, The State of Ohio is picking on him for that reason?

JUROR NO. 4: I don't think so.

{¶ 22} The jury was impaneled, the trial court gave preliminary instructions and the parties' counsel gave opening statements.

**B. The State's Case**

{¶ 23} The state called four witnesses in its case-in-chief at trial.

### 1. The Examination of J.T.

{¶ 24} J.T. testified on direct examination that she was born in 2007 and lived in the same home for her entire life, along with her parents — "Father" and "Mother" — and a sibling. She said that Father and Sanchez's brother met several years ago and became friends. On cross-examination, she admitted that Sanchez's brother still works for Father and they remain friends. She said she sees the brother frequently and had even seen him on the day of her testimony at trial.

{¶ 25} J.T. testified that she met Sanchez and Sanchez's daughter one day when Mother and J.T. went to bring lunch to Father and Father's coworkers. She said Sanchez was working with Father at the time; Sanchez's daughter was waiting in a car for Sanchez to finish work. On cross-examination, J.T. admitted that Sanchez was a single father and was living with his daughter in an apartment at the time. She admitted that Sanchez was trying to do the best to care for his daughter and had brought her to work because he had no one to care for her while he was working.

{¶ 26} J.T. said Mother and J.T. brought Sanchez's daughter home with them that day, fed her and offered her clothes and a shower. She said Sanchez later

came to pick up his daughter and sometime thereafter asked if J.T.'s family could routinely watch his daughter during the day when he went to work with Father. On cross-examination, J.T. admitted that there were times that Sanchez's daughter would spend the night at her house; in fact, the daughter would spend weeks at her house. J.T. could not remember how long Sanchez's daughter stayed with them. J.T. admitted that she would see Sanchez around her house; she and her parents would talk together with Sanchez.

{¶ 27} J.T. testified that Sanchez gave her his cell-phone number when J.T. asked to take his daughter to another family member's house so that she could reach him if needed. J.T. said that the next day was Father's Day and Sanchez's daughter called him from J.T.'s phone to wish him well; she said that is how Sanchez got J.T.'s cell-phone number. J.T. said that, thereafter, she and Sanchez began communicating with each other through calls and text messages. J.T. could not remember who called whom first but said they came to speak together alone every night over the phone. J.T. described that Sanchez would call her, ask her about her day and tell her that she was pretty. She testified that he would ask "why I didn't go with him a night, and after that, I'll keep on asking for more * * *."

{¶ 28} J.T. testified that one day, weeks after Father's Day, there came a time when her parents left the house for some reason while Sanchez and Sanchez's daughter were visiting. She said she took a shower and dried off in the bathroom while her parents were out. She described what happened next as follows:

[PROSECUTOR]: Where did you get dressed?

[J.T.]: In the bedroom. [so in original transcript]

[PROSECUTOR]: [J.T.], what were you wearing after you got dressed in the bathroom?

[J.T.]: I was wearing short pants and a shirt.

[PROSECUTOR]: Did you have on underwear?

[J.T.]: Yes.

[PROSECUTOR]: And were you wearing a bra at that time?

[J.T.]: Yes.

[PROSECUTOR]: And were you wearing a sports bra or a regular bra?

[J.T.]: A sports bra.

[PROSECUTOR]: So [J.T.], what happened when you came out of the bathroom? First of all, which door did you come out of?

[J.T.]: From the hallway.

[PROSECUTOR]: What happened then?

[J.T.]: He is coming up the stairs.

[PROSECUTOR]: When you say he, do you mean Elder?

[J.T.]: Yes.

[PROSECUTOR]: Okay.

[J.T.]: He was coming up the stairs and I asked him what he was doing. He never responds.

[PROSECUTOR]: Had Elder, as far as you know, ever been on that floor of your house?

[J.T.]: No.

[PROSECUTOR]: Did Elder have any reason to be on the floor of that house that you know of?

[J.T.]: No.

[PROSECUTOR]: Does the first floor of your house have a bathroom on it?

[J.T.]: Yes.

[PROSECUTOR]: So were the guests that day using the bathroom on the first floor?

[J.T.]: Yes.

[PROSECUTOR]: What happened when you encountered Elder?

[J.T.]: I asked him what he was doing upstairs. He didn't answer. He just pushed me inside the bathroom again.

[PROSECUTOR]: Now, [J.T.], when you say he pushed you, what do you mean?

[J.T.]: He went to here and pushed me back.

[PROSECUTOR]: When you say here, just because I have to describe what you're gesturing, did he use one hand or 2?

[J.T.]: 2.

[PROSECUTOR]: Where on your body did he shove you, push you?

[J.T.]: On my shoulders.

[PROSECUTOR]: Now, [J.T.], did he push you backwards into the bathroom?

[J.T.]: Yes, he pushed me back and turned me around.

* * *

[PROSECUTOR]: At that time, [J.T.], was your back against the wall or was Mr. Sanchez against the wall?

[J.T.]: I was against the wall.

[PROSECUTOR]: Did he say anything to you?

[J.T.]: No.

[PROSECUTOR]: What did he do next?

[J.T.]:  He took off my pants.

[PROSECUTOR]:  Was he standing or did he get down to do that?

[J.T.]:  He was standing.

[PROSECUTOR]:  What happened next?

[J.T.]:  He took off my underwear and then he took off my shirt, and I asked him what he was doing.  He just told me to shut up.

[PROSECUTOR]:  He told you to shut up?

[J.T.]:  Yes.

[PROSECUTOR]:  What were you doing with your hands or arms at that time?

[J.T.]:  I was trying to block it myself.

[PROSECUTOR]:  What did he do?

[J.T.]:  He was just trying to take off my shirt the whole time, and he was telling me I couldn't do nothing basically.

[PROSECUTOR]:  Were you able to block * * * Mr. Sanchez from touching you?

[J.T.]:  No.

[PROSECUTOR]:  What did he do?

[J.T.]:  He took off my underwear and my sports bra and he started touching me.

[PROSECUTOR]:  So before he started touching you, were you naked at that time?

[J.T.]:  I didn't have any pants on.

[PROSECUTOR]:  Was your shirt still on?

[J.T.]:  Yes.

[PROSECUTOR]:  Did he take your shirt off?

[J.T.]:  At the end, yeah.

* * *

[PROSECUTOR]:  Now, [J.T.], before we took our break this afternoon, you were standing against the wall in between the plant and the door that goes to the guest bedroom, and at this time you had your pants down.  Mr. Sanchez, what was he doing with his arms at that point?

[J.T.]:  He started touching my private part.

[PROSECUTOR]:  When you say private part, what do you mean?

[J.T.]:  My lower part.

[PROSECUTOR]:  Would that be — are you familiar with the term vagina?

[J.T.]:  Yeah.

[PROSECUTOR]:  Is that the part that he was touching?

[J.T.]:  Yes.

[PROSECUTOR]:  [J.T.], when he was touching your vagina, what part of it was he touching?

[J.T.]:  Can you repeat the question?

[PROSECUTOR]:  Did he touch the outside of it?

[J.T.]:  No.

[PROSECUTOR]:  Where did he touch?

[J.T.]:  He put his finger inside.

[PROSECUTOR]:  He put his finger inside?

[J.T.]:  Yes.

[PROSECUTOR]:  [J.T.], is that something you wanted to happen?

[J.T.]:  No.

[PROSECUTOR]: Is that something you asked to happen? Did you ask for that?

[J.T.]: No.

[PROSECUTOR]: Did you try to say anything at that point?

[J.T.]: I have just telling him to stop, but he just kept on saying shut up, so —

[PROSECUTOR]: Did there come a time where he removed his finger from inside you?

[J.T.]: Yes.

[PROSECUTOR]: What did he do with his hands next?

[J.T.]: He touched my breasts.

[PROSECUTOR]: And did he touch your breasts outside of your clothes or inside of your clothes?

[J.T.]: Inside of my clothes.

[PROSECUTOR]: Did he go underneath your shirt?

[J.T.]: Yes.

[PROSECUTOR]: Was he underneath your bra as well?

[J.T.]: Yes.

[PROSECUTOR]: Can you describe how he touched you?

[J.T.]: He like — like if you were grabbing something, like that.

* * *

[PROSECUTOR]: You said he grabbed it or them?

[J.T.]: Yes.

[PROSECUTOR]: What were you doing with your arms at the time he was then grabbing your breasts?

[J.T.]: Tried to push him off.

[PROSECUTOR]:  Were you successful at pushing him off?

[J.T.]:  No.

{¶ 29} J.T. testified that she did not remember Sanchez trying to kiss her during this encounter.  On cross-examination, J.T. continued describing the encounter as follows:

[DEFENSE COUNSEL]: He removes your pants, right?

[J.T.]: Yes.

[DEFENSE COUNSEL]: All the way off?

[J.T.]: Yes.

[DEFENSE COUNSEL]: And he inserts his finger inside of you, correct?

[J.T.]: Yes.

{¶ 30} She said the attack ended when her phone rang and Sanchez let go of her and left the room.  She said that Sanchez told her not to say anything "and left me a message telling me if I said something, he was going to kill my mom and dad."

{¶ 31} According to J.T.'s testimony, at the time of this alleged encounter, J.T. and Sanchez were "friends" on the social-networking site Facebook and communicated over the application's messaging feature, Facebook Messenger.  She said they were also communicating through text messages and over the application WhatsApp.  On cross-examination, J.T. admitted that, at school and through her parents, she was taught about "bad and good touching."  She admitted that she knew that what Sanchez did to her in the bathroom was wrong.  She further admitted that she nevertheless continued communicating with Sanchez for months after the

alleged assault. Defense counsel asked her, "And at that point you were no longer scared of Elder, right?" She answered, "Yes."

{¶ 32} J.T. testified that after this alleged encounter in the bathroom, Sanchez would ask for pictures of her, "normal pictures" like selfies. She said Sanchez would also say, through text messages, that she was pretty and "[w]hy I can't be his a day," which J.T. understood to be Sanchez asking why she would not sleep with him "[l]ike a boyfriend and girlfriend." J.T. said she always told him no.

{¶ 33} J.T. testified that Sanchez at some point began asking J.T. for "naked pictures." She said she declined at first, but Sanchez insisted. She described that he would ask her why she would not send them and promise that he would erase them and "nothing will happen." She continued as follows:

> [PROSECUTOR]: [J.T.], at any point in time, did you take any nude photos of yourself?
>
> [J.T.]: Yes.
>
> [PROSECUTOR]: And was this before you were 13 years old?
>
> [J.T.]: Yes.
>
> [PROSECUTOR]: Was this while you were 11?
>
> [J.T.]: Yes.
>
> [PROSECUTOR]: What about when you were 12?
>
> [J.T.]: At 12 it was when we first blocked him.
>
> * * *
>
> [PROSECUTOR]: Going back to when you were 11, let's take one step back, [J.T.] How many times did you send nude photos to Mr. Sanchez-Sanchez?

[J.T.]:  Like around two or three.

[PROSECUTOR]:  I know this is difficult and probably a little awkward. Can you describe the photos that you took of yourself?

[J.T.]:  I have — just like on my phone, I would take pictures. I don't remember if I used the mirror, but I think I did.

[PROSECUTOR]:  Okay.

[J.T.]:  I just took the pictures and just sent it.

[PROSECUTOR]:  Were you wearing any clothes at all in those photos?

[J.T.]:  No.

[PROSECUTOR]:  You were completely naked?

[J.T.]:  Yes.

[PROSECUTOR]:  No underwear?

[J.T.]:  No.

[PROSECUTOR]:  No bra?

[J.T.]:  No.

[PROSECUTOR]:  No shirt?

[J.T.]:  No.

[PROSECUTOR]:  Was your face visible in those photos?

[J.T.]:  I think.

{¶ 34} J.T. testified that she took these photographs with her iPhone, sent the message through an application — not regular text messages — and then deleted the photographs and the messages after sending them from her phone.  She said she also deleted Sanchez's messages requesting the nude photographs.

{¶ 35} J.T. testified that Sanchez sent her one picture of himself which she described as a picture of his lap when he was wearing underwear.

{¶ 36} Mother came to learn that Sanchez was communicating with J.T. and told J.T. to block Sanchez. On cross-examination, J.T. admitted that she was no longer afraid of Sanchez at the time her parents confronted her about the text messages but she did not tell them about the alleged assault in the bathroom. She further admitted that Father confronted Sanchez about the text messages but allowed Sanchez to continue working for him.

{¶ 37} J.T. initially testified that, after Mother told her to block Sanchez, J.T. never talked to him again. But after the prosecutor admonished J.T. that "[w]e need you to be honest," J.T. admitted that she continued to talk with Sanchez after Mother told her not to do so; they kept talking to each other through WhatsApp. J.T. explained that she believed she had fallen in love with Sanchez. She said the nature of their communications at this time was "like hi, how are you, fine, and you, like you're pretty today, thank you." She admitted that she continued texting with Sanchez, despite knowing that she would get in trouble for doing so. She said that, on days that she did not initiate the text conversation, Sanchez would text her first.

{¶ 38} J.T. said that Mother and Father at some point were able to monitor what she did with her phone and saw some of the continued messages going back and forth between J.T. and Sanchez. She said Mother and Father confronted her again, told her to stop and asked her why she had not stopped when they initially told her to stop. She said they warned her that "this is going to be worse than it was."

{¶ 39} J.T. said Sanchez was present during this second confrontation. J.T. described the confrontation as follows:

> [Mother] sat us both down, and she was telling us that what we were doing was wrong and that that was wrong and he shouldn't have done that, and then she just kept on saying that what happened to her, it was almost like this, but different, and he said that it was never going to happen again. After that, he went back to work with my dad, and I was upstairs.

{¶ 40} On cross-examination, J.T. admitted that her parents were "pretty mad" during the second confrontation about the text messages. She said she had not seen Sanchez in person since that confrontation until seeing him at trial.

{¶ 41} J.T. said she did not tell her parents during this confrontation that Sanchez had requested, and she had sent, nude photographs of herself. She said she also did not tell them about the attack in the bathroom. She testified that she did not tell them because she was scared "[t]hat something bad would happen to my parents."

{¶ 42} J.T. said that Mother and Father came to figure out "what happened with the photos," but she does not know how they figured it out. She said her parents told a cousin who tried to talk to J.T. about "the photos." J.T. testified that she did not tell the cousin about "the photos" or "anything else that was going on." She said that she tried to tell the cousin about the encounter in the bathroom, but her parents walked into the room, so she stopped.

{¶ 43} J.T. and Sanchez continued communicating electronically after the second confrontation. J.T. testified that she "completely fell in love with him, and I knew that it was wrong, but I kept on doing it."

{¶ 44} J.T. identified photographs of text messages she said she exchanged with Sanchez through the WhatsApp application on October 5, 2019. She identified a photograph of herself holding a cousin. She said that this was an example of the kind of "non-nude photographs" that she would send Sanchez; she said that Sanchez had not requested this photograph, she just sent it on her own. She testified that Sanchez sent her a "winking face emoji" during the conversation. She related that several messages had been deleted by Sanchez, and she explained that if Sanchez deleted a message from his application, the message would also be deleted in her application.

{¶ 45} She said her parents discovered the ongoing communication and confronted J.T. a third time. J.T. told them that she was sorry and would not do it again, but her parents told her it was "too late" because they had reported the situation to the police. On cross-examination, J.T. admitted that Mother was "really upset" and yelled at J.T. during this third confrontation about the ongoing communication.

{¶ 46} J.T. identified several messages her mom had sent to Sanchez from her phone, pretending to be her, including a message asking Sanchez if he was sleeping.

{¶ 47} J.T. said that nothing happened with the police at that time.

{¶ 48} She testified that when she went back to school, she was called into an office. She said the school employee told her that somebody had called her and told her "what was happening;" J.T. believes that Mother had called the school. She said during this conversation she finally disclosed the assault. She continued as follows:

[PROSECUTOR]: Somebody had referred something to the school?

[J.T.]: Yes.

[PROSECUTOR]: And is that the first time you really told anybody the full story of what happened in the bathroom?

[J.T.]: Yes.

[PROSECUTOR]: After you told the school, did the police get involved?

[J.T.]: Yes.

{¶ 49} On cross-examination, J.T. admitted that she told her parents about the incident in the bathroom after she got out of school and after her parents told her that they had gone to the police.

{¶ 50} J.T. said her parents met with the police first, then J.T. met with two people and described her interactions with Sanchez. She said she told those interviewers about "what happened." J.T. did not recall what time of year she met with these two people but said it was "a long time" after the encounter in the bathroom.

{¶ 51} On cross-examination, J.T. admitted that she loves her parents very much and does not like to disappoint them. She further admitted that she does not like to be in trouble and, when she gets in trouble, she is sad. She testified that her parents never spanked her. She admitted that her parents want to protect her. She

also testified that she recalled her parents reporting Sanchez to immigration authorities and thought her parents wanted Sanchez to be deported.

## 2. The Examination of Mother[2]

{¶ 52} Mother testified that she met Sanchez through Sanchez's brother and that Sanchez came to work for Father's tree-cutting company. She said she also met Sanchez's daughter, who she thought was around seven years old at the time. She said she invited the daughter to stay at her home. She related that J.T. would take care of Sanchez's daughter, they played together and the daughter would sleep in J.T.'s room. Mother did not know specifically how long the daughter slept in their home but it was longer than a week. Mother said Sanchez would come to visit his daughter and, when he did, he would interact with J.T. as well.

{¶ 53} Mother testified that she and Father held a family get-together "around the summertime" while Sanchez's daughter was staying with them. She said Sanchez attended the get-together. Mother said that Sanchez and J.T. were both in the home's living room at some point during the get-together, but this was not out of the ordinary because Sanchez's daughter was also there. From her perspective, she said, they were "just chatting." Mother said she did not see anything out of the ordinary that day. But she said that sometime after this get-together, her sister-in-law called her with a concern about J.T.'s interaction with Sanchez. After the call, Mother decided to "be more attentive of everything that was happening"

---

[2] Mother testified through an interpreter.

and to keep a closer eye on J.T. when Sanchez was around. She testified that she did not remember observing any unusual behaviors from J.T., but she did note that J.T. was on her phone more often.

{¶ 54} Mother testified that between one and two months after this get-together, she and Father returned home early in the morning after dropping off a rented machine to find Sanchez texting from his cell phone in their garage. She said that they saw J.T. in the living room when they went inside, holding her phone in her hands. She said she and Father found this unusual because J.T. was awake hours earlier than she normally would be. Mother testified that by this point, "[w]e already knew something was going on." She said Father grabbed the phone from J.T.'s hands and gave it to Mother. Mother said she saw a message on the phone that said, "[I]t's been a long time that I have seen you, I'm here at your house, make me some coffee." She admitted that the messages she saw were not sexual in nature.

{¶ 55} Mother testified that she became very angry and spoke to J.T. "very strongly." She said she told J.T. that if "something was going on," J.T. should have come to them. She said she asked J.T. what the text messages were about and J.T. responded that Sanchez called her because he wanted some coffee and she went to give him the coffee. Mother said she told J.T. in no uncertain terms that this type of text messaging was not permitted. Mother said she spanked J.T. twice. Mother testified that she does not normally spank J.T. and the punishment made J.T. very nervous.

{¶ 56} Mother testified that Sanchez saw Mother and Father disciplining J.T. from outside and came to the kitchen door. Mother said she told Sanchez "that I was not about to allow him or anyone else to disrespect my daughter." She said she told him that she had gone through something hard "that marked me for the rest of my own life and that I did not want that to happen to my daughter * * *." Mother said she warned Sanchez that the next time he text messaged J.T., Mother was going to report him to the police. She testified that Sanchez asked her to forgive him and assured her "that nothing else was going to happen * * * and that that was not going to happen again."

{¶ 57} Mother testified that Sanchez continued working for Father after this confrontation. Mother said that Sanchez had come to their house many times between the summer get-together, but after the confrontation in the family garage, he had never come inside. Mother stated that after this confrontation in the garage, the arrangement was that "[h]e kept on working, but away from my house's reach."

{¶ 58} Mother testified that the family took a road trip with Sanchez, Sanchez's wife and Sanchez's two children for about a half hour to go to a river at some point that year.

{¶ 59} Mother admitted that she did not notice any drastic behavioral changes in J.T. as the summer went by although J.T. did seem more quiet. She said that sometimes J.T. would be really upset, but she attributed this to "a teenage thing." Mother said she did not see anything that would indicate that there were ongoing communications between Sanchez and J.T.

{¶ 60} Mother testified that sometime later, in the late summer or early fall after J.T. started school, Mother and Father checked J.T.'s phone again. She said they saw that Sanchez was texting J.T. as they were looking at the phone. Mother said she was very angry and communicated with Sanchez, pretending to be J.T. Mother testified that Sanchez was asking J.T. for something but Mother did not know what he was requesting. She said Sanchez tried calling the phone but she did not answer.

{¶ 61} Mother identified photographs she had taken of J.T.'s phone, documenting the messages she saw and the phone call. Mother denied sending the text message asking Sanchez whether he was sleeping. Mother said she talked to J.T. to find out what Sanchez was asking for in the messages and she came to learn that Sanchez was asking for money. Mother said J.T. did not report that Sanchez had asked her for anything besides money.

{¶ 62} Mother said she went to immigration authorities the next day and gave them J.T.'s cell phone and laptop. She said she saw Sanchez there. Mother said she then went to the police department, but the police told her they could not take a report because Mother did not have any suspicious photographs or other physical evidence.

{¶ 63} Mother described a conversation in which she asked J.T. whether J.T. had ever sent Sanchez any photographs. She said J.T. did not want to talk to Mother, which Mother found unusual because J.T. talked to her a lot. At some point after this conversation, J.T. did tell Mother that she had sent nude photographs to

Sanchez. Mother said she did not ask any follow-up questions of J.T. about these photographs but did ask J.T. whether there had been any physical contact between her and Sanchez. Mother said J.T. seemed nervous and did not answer. Mother told J.T. that if J.T. were not open and honest, her parents were not going to be able to help her. J.T. then "disclosed what happened to [her]."

{¶ 64} Mother said she then talked to Father and J.T.'s school and J.T. started going to therapy. Mother said she was then able to go back to the police department and file a report, after which a detective followed up with Mother, Father and J.T.

### 3. The Examination of Father[3]

{¶ 65} Father said that he recently had a "bad accident" and forgets things as a result.

{¶ 66} Father testified that he owns a tree-cutting business. He said that he knew Sanchez's brother for "around 15 years" and came to meet and employ Sanchez in 2019 through that brother.

{¶ 67} Father testified that there was a day where he and Mother came home from making a delivery to find Sanchez in their garage, texting. Father said that he saw Sanchez coming out of their house and confronted him, asking him what he was doing there. Father said he went inside and found J.T. awake in their living room, "which had never happened before." Father testified that he did not believe J.T. was

---

[3] Father testified through an interpreter.

texting that day. Father asked J.T. what she was doing and J.T. was "obviously very nervous." Father said that J.T. said Sanchez was "just drinking coffee." Father at first testified that he could not recall whether he grabbed J.T.'s phone that day. He later confirmed that he did not take her phone that day but he said he did confront her. Father testified that Mother was not present when this happened.

{¶ 68} Father could not remember what happened next, but said, "I do know that we went through immigration to report him, but I don't know if that happened right around that time. I don't really remember."

{¶ 69} Father testified that there came a time where he took J.T.'s phone. He could not remember when he took the phone, explaining that "I don't really remember well." He could not say whether this happened at the beginning of the summer, in the middle of the summer, or at the end of the summer. Nevertheless, he testified that he looked at J.T.'s phone, gave the phone to Mother and saw text messages between Sanchez and J.T. on the phone. Father said he "didn't pay a lot of attention" to the messages "because I gave the phone to my wife." He said the messages may not have referred to sex, "but they were not appropriate conversations for a child." Father could not recall what the messages said, though. Father said that he "think[s]" he talked to J.T. after seeing these messages but was not really sure. Father at first said he thought that J.T. told him about sending nude pictures after this first confrontation, but later said it might have been a couple weeks later.

{¶ 70} Father could not recall whether Sanchez was present when they took J.T.'s phone but said he thinks he and Mother confronted Sanchez the next day.

{¶ 71} Father said that he and Mother were angry and did not want Sanchez texting their daughter; they wanted to protect her. Father said that Mother gave J.T. "[two] spankings." Father said they made it clear to both Sanchez and J.T. that they did not want them communicating with each other.

{¶ 72} Father admitted that he continued working with Sanchez after this confrontation for "[a] couple more days."

{¶ 73} Father admitted that Sanchez accompanied Father's family on a trip to a river. Father could not recall if the trip was before, or after, the confrontation about the text messages.

{¶ 74} Father said a long period of time, probably a couple months, passed before he saw a second set of text messages between J.T. and Sanchez. Father said he did not think J.T. and Sanchez had any physical contact in those two months. He said he did not check J.T.'s phone during that time and believed that they were not communicating with each other. Father said he did not notice any behavioral changes in J.T. during that time.

{¶ 75} Father testified that he was the first person to notice that there were more messages between J.T. and Sanchez after this two-month period. He said he did not look at the content of the text messages and gave the phone to Mother so that she could read the messages. He testified that Mother then pretended to be J.T. in order to discover the topics about which Sanchez and J.T. were talking.

{¶ 76} Father said he does not remember seeing any reference to anything sexual in the messages, but he said he "was very upset." Father said he asked J.T.

about the text messages and J.T. told him the conversation was about money. Father testified that he did not believe that explanation. Father said that he and Mother were both angry and upset when they confronted J.T. Father said that J.T. knew that she was not supposed to be texting Sanchez and was disobeying her parents by doing so.

{¶ 77} Father testified that Sanchez had continued working for him up to this point.

{¶ 78} Father said that he and Mother went to immigration authorities with J.T.'s laptop and cell phone to report Sanchez's contact with J.T. Father testified that they decided to go to immigration authorities because they knew that Sanchez "was illegally here" and would be reporting "to immigration" that day. He said they saw Sanchez at "the immigration building." Father said he believed that Sanchez knew that Father was there that day to report him. Father said that he and Mother were told that the situation "was a matter for the police."

{¶ 79} Father said that Sanchez stopped working for him after they reported Sanchez to immigration authorities.

{¶ 80} Father testified that the police were not able to take a report, initially. He said the police were only able to make a report after the school social worker made a report. Father could not remember if he spoke with the police after the social worker made this report.

{¶ 81} The state asked Father questions about Sanchez leaving Cleveland and Father testified as follows:

[PROSECUTOR]: So once the police were able to do something about it later on, did you become aware that they were looking for Elder?

[FATHER]: Yes.

[PROSECUTOR]: Do you know if Elder was still located in Cleveland at the time?

[FATHER]: He was.

[PROSECUTOR]: Did there come a time where you learned that Elder was no longer in Cleveland?

[FATHER]: Yes.

[PROSECUTOR]: How did you find that out, and I don't want to know what somebody told you. How did you find out?

[FATHER]: I was having a conversation with a person that is a family member of Elder's. This person said where Elder was now.

[PROSECUTOR]: Did you learn where Elder was?

[FATHER]: No.

[PROSECUTOR]: Did you eventually learn where Elder was?

[FATHER]: Yes.

[PROSECUTOR]: And did you provide that information to the police?

[FATHER]: The person who told me where he was is the one that told the detective where he was.

[PROSECUTOR]: And do you know where the police found Elder?

[FATHER]: In New York, but I wouldn't know the address.

{¶ 82} On cross-examination, Father said he remembered hosting an event in the summer of 2019 but said he could not remember if it was a birthday party, just a family gathering or something different. Father testified that Sanchez attended the party with Sanchez's daughter. Father said that he "was not really

paying attention to what may have been going on" at the party. Father testified that he could not remember whether he saw anything out of the ordinary between Sanchez and J.T. at that party. Father admitted that he continued to employ Sanchez after this party.

{¶ 83} Father testified, on cross-examination, as follows:

[DEFENSE COUNSEL]: You stayed in communication with Elder, correct?

[FATHER]: Not all the time. Sometimes. I wanted to be aware of his whereabouts.

[DEFENSE COUNSEL]: Enough for you to send a picture of your broken leg?

[FATHER]: I really don't see why I wouldn't.

[DEFENSE COUNSEL]: This is after these allegations have come out, right?

[FATHER]: Yes, but even though I knew what had happened, I never really thought that he was capable of doing something like that. I thought of him as my friend still. I never really believed that he would be able to do something like that.

[DEFENSE COUNSEL]: So on December 1st, 2019 after all these allegations have been brought forth, you did believe he was capable of doing it, correct?

[FATHER]: I don't know what to tell you.

### 4. The Examination of Detective Richard Tusing

{¶ 84} Detective Richard Tusing, now a homicide detective, testified that he has worked for the Cleveland Police Department for 28 years, first as a patrol officer for 20 years and he then joined the Sex Crimes and Child Abuse Unit as a detective.

He said he was in that unit for seven and one-half years, during which time he investigated the allegations against Sanchez.

{¶ 85} Tusing testified that on November 10, 2019, J.T.'s family reported an alleged rape involving J.T. and Sanchez. He said he was assigned to follow up on that report. He said he did "research background checks" on everyone who was listed in the report and arranged to have J.T. interviewed.

{¶ 86} Tusing testified that Mother and Father brought J.T. to a child-advocacy center for a forensic interview on November 19, 2019 with an interviewer from the Cuyahoga County Division of Children and Family Services. Tusing said he and his partner, another detective, observed the interview from another room.

{¶ 87} Tusing admitted on cross-examination that this interview was recorded, and he heard J.T. tell the interviewer that Sanchez had kissed her. Tusing admitted that Sanchez was on trial for gross sexual imposition for allegedly kissing J.T. and he repeated that J.T. told them in her interview that Sanchez had kissed her in the bathroom. Tusing said he does not consider it to be inconsistent that J.T. testified at trial that Sanchez had not kissed her during the encounter in the bathroom.

{¶ 88} Tusing further testified on cross-examination that J.T. told the interviewer that the assault in the bathroom stopped when Sanchez's daughter came back into the house "because they had come back from the beach or somewhere" and she was looking for J.T. or Sanchez. Tusing said he did not recall J.T. telling the interviewer that the assault stopped when her phone rang. On redirect, Tusing

testified that, in his experience, child victims "will remember different key parts of an incident" as time goes on.

{¶ 89} Tusing testified that in his years working in the sex-crimes unit, he had the opportunity to work with sexual assault nurse examiners ("SANE nurses"). Tusing said that the family's report to law enforcement in this case occurred a few months after the alleged rape. He further testified that there is no need to have a SANE nurse examine a patient after the passage of a few months "because you're not going to be able to retrieve any type of evidentiary evidence after 72 to 96 hours." On cross-examination, Tusing admitted that the SANE nurse is specifically trained to do a physical examination of a patient, retrieve DNA evidence if available, photograph possible injuries and administer a "rape kit." Tusing further admitted that a victim — like an 11-year-old girl — could possibly experience "some tearing" during a sexual assault. On redirect, Tusing said there is no evidentiary value in having an alleged crime victim undergo a SANE examination two months after an alleged offense.

{¶ 90} Tusing testified that he interviewed Mother at the child advocacy center. Tusing admitted that he did not ask Mother about what she knew about the alleged assault in the bathroom; he said he did not ask her because she did not witness the alleged assault and was not home at the time it allegedly occurred.

{¶ 91} Tusing testified that he interviewed Father at the family's home. He said he had to interview Father at home because Father "was working a lot, and he

wasn't able to make it in" for an interview.  Tusing said that on one occasion, Father also was bedridden with a broken leg during an interview.

{¶ 92} Tusing testified that he did not photograph the bathroom in J.T.'s home because "I didn't see that it was anything because months later of anything of really evidentiary value of actually doing that."  On cross-examination, Tusing admitted that detectives are generally trained to take photographs of crime scenes when there is an opportunity to do so.  He further admitted that he never went into the bathroom, despite knowing that the bathroom was the alleged crime scene.  Tusing further admitted that he never asked for the clothes that J.T. was wearing during the alleged assault, even though he could have asked for them and submitted them to a laboratory.  Tusing said he felt it had been too long since the assault for any evidence to be collected from the clothing but he did admit that he never asked the family if those clothes had been washed since the alleged assault.  On redirect, Tusing testified that the state laboratory would decline to process clothing collected two months after an alleged assault.

{¶ 93} Tusing testified on cross-examination that Mother and Father had given J.T.'s Chrome Book and cell phone to immigration authorities.  Tusing said that law enforcement attempted to forensically examine the devices.  Tusing said that law enforcement were not able to complete the examination on the Chrome Book.  He said that he did not believe any text messages or photographs were recovered from the examination of the cell phone. On redirect, Tusing testified that material that has been deleted by a user is not always recoverable from a cell phone.

{¶ 94} Tusing testified that he, or his partner, obtained search warrants for accounts on the social-media applications Instagram and Facebook. He admitted that he did not seek a search warrant for the application WhatsApp, despite knowing that there were communications between J.T. and Sanchez through WhatsApp. He admitted that he did not seek a search warrant or a subpoena for any cell-phone records, despite knowing J.T.'s phone number and despite knowing Sanchez's phone numbers. He further admitted that there was a possibility that if he had done so, he may have obtained text messages.

{¶ 95} Tusing testified that he came to learn through this investigation that Sanchez was 29 years old and had been living a short drive from J.T.'s home. Tusing could not remember the exact address, but he said he knew it was off of Storer Avenue on the west side of Cleveland.

{¶ 96} Tusing testified that law enforcement obtained an arrest warrant for Sanchez and attempted to execute the warrant in November or early December 2019. Tusing described his knowledge of the circumstances of that attempt as follows:

> [DETECTIVE TUSING]: I informed the supervisor at what is called our NICE unit. They would go out and look for people with — that we issue arrest warrants for. I related what information I had, and they went out and attempted to locate him.
>
> * * *
>
> [PROSECUTOR]: Based on their attempt, what did you learn?
>
> [DETECTIVE TUSING]: I learned that they went to Mr. Sanchez's house, attempted to arrest him. They couldn't — they could see signs

in the house that somebody was there, but they were unable to get in [so in original transcript] to answer the door.

\* \* \*

[PROSECUTOR]: Did another attempt to arrest Mr. Sanchez-Sanchez on that warrant — was another attempt made?

[DETECTIVE TUSING]: We wound up learning that he had fled the state.

[PROSECUTOR]: When did you learn that?

[DETECTIVE TUSING]: It was shortly after, a day, maybe 2 days. I know it was very shortly after, within a week [of] the NICE unit going out to his house to arrest him.

{¶ 97} Tusing continued testifying on cross-examination as follows:

[DEFENSE COUNSEL]: You get an arrest warrant, correct?

[DETECTIVE TUSING]: Yes.

[DEFENSE COUNSEL]: And there is an intent to go arrest [Sanchez] at the home that you believe he lived at, correct?

[DETECTIVE TUSING]: Yes.

\* \* \*

[DETECTIVE TUSING]: To the best of my knowledge, they related information to me that they believed people were in the house, but nobody would answer the door.

[DEFENSE COUNSEL]: You were not there, correct?

[DETECTIVE TUSING]: I was not there.

[DEFENSE COUNSEL]: You have no information, no personal knowledge, whether [Sanchez] was at that house that night, do you?

[DETECTIVE TUSING]: I don't believe anybody does, because nobody answered the door.

[DEFENSE COUNSEL]:  That's my point.  We don't know if [Sanchez] was there that night or not there that night, right?

[DETECTIVE TUSING]:  Correct.

{¶ 98} Tusing testified that Father received information in February 2020 that Sanchez had gone to New York.  Tusing said Father "provided me with [a] possible location in New York for him."  Tusing said he passed the information on to a law-enforcement "fugitive unit" that has federal resources to locate people who may be outside of Cuyahoga County.  Tusing said that this unit, in turn, contacted authorities in New York.  Tusing testified that authorities were able to locate and arrest Sanchez in New York state.  Tusing said he thought the U.S. Marshals arrested Sanchez, through the U.S. Marshals' Violent Fugitive Task Force.  Tusing said the arrest had nothing to do with Sanchez's immigration status and immigration authorities were not involved in the arrest.  Tusing admitted on cross-examination that Sanchez had not resisted arrest in New York and, in fact, waived extradition back to Ohio.

{¶ 99} As to how Father received information on Sanchez's location, Detective Tusing testified as follows:

[PROSECUTOR]:  Detective Tusing, did you ever inquire as to how [Father] obtained the information as to where Mr. Sanchez-Sanchez was?

[DETECTIVE TUSING]:  Yes.

[PROSECUTOR]:  How so?

[DETECTIVE TUSING]:  How did I acquire it?

[PROSECUTOR]:  Did you learn how it was acquired?

[DETECTIVE TUSING]: Yes.

[PROSECUTOR]: How was it acquired?

[DETECTIVE TUSING]: [Father] had talked to people that he knew in New York and offered a reward for his location.

{¶ 100} The state rested its case after the detective's testimony.

## C. The Motion for Acquittal and the Defense Case

{¶ 101} After the close of the state's case, the state moved for a nolle prosequi as to Count 3, which had alleged that Sanchez committed gross sexual imposition by kissing J.T. The defense indicated that it had no objection to that motion. As a result of the nolle prosequi, the illegal-use-of-a-minor-in-nudity-oriented-material charge was renumbered as Count 3.

{¶ 102} Sanchez moved for acquittal on all the charges pursuant to Crim.R. 29. The trial court denied the motion.

{¶ 103} The defense did not present a case.

{¶ 104} The state then admitted 15 exhibits, with no objection from the defense.

## D. Closing Arguments and Jury Instructions

{¶ 105} The defense objected to the court's intent to provide a jury instruction regarding flight. The trial court overruled the objection and instructed the jury as follows after closing arguments and the defense's renewed motion for acquittal:

Testimony has been admitted indicating that the Defendant fled the scene. You're instructed that the Defendant's flight alone does not raise

a presumption of guilt. But it may tend to indicate the Defendant[']s consciousness or awareness of guilt.

If you find that the facts do not support that [so in original transcript] the Defendant[']s flight or if you find that some other motive prompted the Defendant's conduct or if you're unable to decide what the Defendant[']s motivation was, then you should not consider the evidence for any purpose.

However, if you find that the facts support that the Defendant engaged in such conduct and if you decide that the Defendant was motivated by a consciousness or an awareness of guilt, you may, but are not required, to consider that evidence in deciding whether the Defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to the evidence.

{¶ 106} During the closing argument, defense counsel stated that "Elder [Sanchez-Sanchez] came to Cleveland illegally from Honduras with his 7-year-old daughter." Counsel argued that Mother and Father wanted Sanchez to be deported, which is why they reported Sanchez to immigration authorities. He argued that "[t]hey knew he is illegally here, and we're going to get him deported."

{¶ 107} As it relates to the state's argument that Sanchez fled to New York to avoid arrest and prosecution, defense counsel argued that Sanchez went to New York, not to avoid arrest for assaulting J.T., but rather, because "he is here illegally with a 7-year-old child" and "because he was scared of immigration and eventually getting deported."

{¶ 108} Sanchez renewed his motion for acquittal after closing arguments. The state did not object to the timing of the renewed motion. The trial court allowed the motion and denied it, finding Sanchez's guilt or innocence to be a question for the jury.

**E. The Verdict**

{¶ 109} After deliberating, the jury returned its verdict. The jury found Sanchez guilty of rape, gross sexual imposition and illegal use of a minor in nudity-oriented material or performance. With regard to the rape conviction, the jury further found that Sanchez compelled J.T. to submit by the use of force or the threat of force and that J.T. was less than 13 years old at the time of the offense. With regard to the gross-sexual-imposition conviction, the jury further found that J.T. was less than 13 years old at the time of the offense.

{¶ 110} The defense requested that the jury be polled and each juror confirmed the verdicts.

**F. The Sentence and Appeal**

{¶ 111} The case proceeded to sentencing on September 14, 2021. Sanchez addressed the trial court, maintaining his innocence, and the state submitted impact letters from J.T., Mother and Father. The trial court sentenced Sanchez to imprisonment for 25 years to life on Count 1 (rape), five years on Count 2 (gross sexual imposition) and six years on Count 3 (illegal use of a minor in nudity-oriented material or performance, formerly Count 4). The court imposed the sentences concurrently and gave Sanchez credit for over a year and half of pretrial detention.

{¶ 112} Sanchez appealed, raising the following seven assignments of error for review:

> First Assignment of Error: The trial court erred by failing to grant a judgment of acquittal pursuant to Crim.R. 29(A), on all three remaining counts of the indictment, and thereafter entering a

judgment of conviction of that offense which was not supported by sufficient evidence, in derogation of Mr. Sanchez's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

Second Assignment of Error: The trial court erred by entering a judgment of conviction, on all three remaining counts of the indictment, that was against the manifest weight of the evidence, in derogation of Mr. Sanchez's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

Third Assignment of Error: The trial court committed structural error, in violation of the Due Process Clause of the United States Constitution, when present on the bench was a judge who was not impartial, but rather was biased against Mr. Sanchez.

Fourth Assignment of Error: The trial court abused its discretion in giving the jury a flight instruction when there was no evidence that Mr. Sanchez attempted to evade prosecution.

Fifth Assignment of Error: Trial counsel for Mr. Sanchez failed to provide effective assistance of counsel, guaranteed by both the United States Constitution and the Ohio Constitution.

Sixth Assignment of Error: The trial court committed plain error, in violation of both the rule against hearsay, and Mr. Sanchez's right to confrontation under the United States Constitution, when it admitted testimony regarding reward money offered by Father.

Seventh Assignment of Error: The cumulative effect of multiple errors at trial, even if singularly not sufficient to warrant reversal, together deprived [Sanchez] of a fair trial and a denial of due process.

## II. Law and Analysis

### A. First Assignment of Error — Sufficiency of the Evidence

{¶ 113} Sanchez contends that the state did not present sufficient evidence to support a conviction and he says the trial court should, therefore, have granted his Crim.R. 29(A) motion for acquittal on each of the rape, gross-sexual-imposition and illegal-use-of-a-minor counts.

{¶ 114} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Crim.R. 29(A) mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. Crim.R. 29(A) (the trial court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses"); *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21. Accordingly, we apply the same standard of review to a trial court's denial of a defendant's motion for acquittal as we use when reviewing sufficiency of the evidence. *Id.* at ¶ 22–23 ("Crim.R. 29(A) and sufficiency of evidence review require the same analysis."), citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571.

{¶ 115} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 116} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v.*

*Bankston*, 10th Dist. Franklin No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). The appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 117} The elements of an offense may be proven by direct evidence, circumstantial evidence or both. *See, e.g.*, *State v. Wells*, 8th Dist. Cuyahoga No. 109787, 2021-Ohio-2585, ¶ 25, citing *State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). "Direct evidence exists when 'a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish.'" *Wells* at ¶ 25, quoting *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence is "evidence that requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *Wells* at ¶ 25, quoting *Cassano* at ¶ 13; *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[C]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in

accordance with the common experience of mankind.")  Circumstantial evidence and direct evidence have "equal evidentiary value."  *Wells* at ¶ 26, citing *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.

{¶ 118} We address Sanchez's argument as to each count of conviction, in turn.

### 1. There was Sufficient Evidence to Support the Rape Conviction

{¶ 119} Ohio Revised Code Section 2907.02 states, in relevant part, that a person commits rape by "engag[ing] in sexual conduct with another * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."  R.C. 2907.02(A)(1)(b).

{¶ 120} "Sexual conduct" includes, among other things, "the insertion, however slight, of any instrument, apparatus, or other object into the vaginal * * * opening of another" without the privilege to do so.  R.C. 2907.01(A).  The insertion of a finger into another person's vaginal opening — digital penetration — is "sexual conduct."  *E.g.*, *State v. Jackson*, 2015-Ohio-5490, 63 N.E.3d 410, ¶ 44 (2d Dist.) (victim testified that the defendant twice "fingered her vagina on the inside"); *State v. White*, 3d Dist. Seneca No. 13-16-21, 2017-Ohio-1488, ¶ 36 (victim testified that the defendant "put his fingers down in [her] vagina"); *State v. Smith*, 10th Dist. Franklin No. 03AP-1157, 2004-Ohio-4786, ¶ 19 (victim testified that the defendant "put his finger in her 'pee-pee'").

{¶ 121} If a person purposely compels a victim who is at least 10 years old but less than 13 years old to submit to sexual conduct by force or threat of force, then

the offender is subject to a mandatory sentence of imprisonment for 25 years to life. R.C. 2971.03(B)(1)(c).

{¶ 122} Sanchez argues that the evidence was not sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that Sanchez inserted his finger into J.T.'s vagina. He contends that the rape conviction relies solely on the testimony of J.T., who was 11 or 12 years old at the time the alleged digital penetration occurred and who testified about the alleged incident when she was 13 years old. Sanchez argues that the state laid no foundation to establish that J.T. knew what her vagina was — as opposed to, say, her labia or other genital structures — and the testimony the state elicited from J.T. about the alleged penetration was vague. Sanchez's position is that it would be unreasonable to assume that a child as young as J.T. knows enough about their anatomy to distinguish their vagina from other genital structures around the vagina in the absence of testimony establishing that knowledge.

{¶ 123} Sanchez argues that J.T.'s testimony was vague with respect to where Sanchez touched J.T. We disagree.

{¶ 124} "[A] victim's testimony alone is sufficient to support a rape conviction." (Citation omitted.) *State v. Roan*, 8th Dist. Cuyahoga No. 108917, 2020-Ohio-5179, ¶ 21.

{¶ 125} Moreover, Ohio courts have consistently held that if the force of an object — like a finger — causes a victim's labia to spread, that is sufficient penetration to constitute "sexual conduct" under the statute; it is not necessary for

an object to penetrate into the vagina. *E.g., Roan* at ¶ 20 ("'[E]vidence of slight penetration, entering the vulva or labia, is sufficient to support a rape conviction.'"), quoting *State v. Falkenstein*, 8th Dist. Cuyahoga No. 83316, 2004-Ohio-2561, ¶ 16; *State v. Artis*, 6th Dist. Lucas No. L-19-1267, 2021-Ohio-2965, ¶ 97 ("[A]lthough perhaps medically imprecise[,] legally[] the vagina begins at the external genitalia, not some deeper internal structure.").[4]

{¶ 126} Even assuming *arguendo* that J.T. did not know enough about anatomy to distinguish her vagina from other genital structures, her testimony makes clear that Sanchez touched the "inside" of her "lower" "private part," as opposed to the "outside" of it. She further confirmed that Sanchez "insert[ed] his finger inside of [her]." Viewing the evidence in the light most favorable to the state — as we must — this testimony was sufficient to establish actionable penetration.

{¶ 127} Sanchez refers us to *State v. Ferguson* — 5 Ohio St.3d 160, 450 N.E.2d 265 (1983) — but that case does not require reversal here. In *Ferguson*, the

---

[4] *See also State v. Strong*, 1st Dist. Hamilton Nos. C-100484 and C-100486, 2011-Ohio-4947, ¶ 54 ("[P]enetration of the labia was sufficient to prove penetration of the vagina for purposes of satisfying the element of sexual conduct as defined in R.C. 2907.01(A) * * * the labia is the anterior of the female genital organ."); *State v. Svoboda*, 1st Dist. Hamilton Nos. C-190752 and C-190753, 2021-Ohio-4197, ¶ 35 (testimony that the defendant put his fingers "towards the upper part on the vagina on the inside of, like, the skin there" was sufficient evidence of penetration); *State v. Wright*, 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, ¶ 164–65; *State v. Patterson*, 5th Dist. Tuscarawas No. 2020 AP 12 0025, 2021 Ohio App. LEXIS 2361 (July 12, 2021), ¶ 24 ("Courts have consistently held that vaginal penetration is proved when any object is applied with sufficient force to cause the labia majora to spread."); *State v. Melendez*, 9th Dist. Lorain No. 08CA009477, 2009-Ohio-4425, ¶ 9–13; *State v. Sanchez*, 11th Dist. Ashtabula No. 2018-A-0097, 2020-Ohio-5576, ¶ 47 ("[I]nsertion of an object inside a female's vulva or labia, without penetration into the vaginal cavity itself, constitutes 'sexual conduct' to establish rape.").

only evidence presented as to penetration was the victim's statement that "we had intercourse a couple times." *Ferguson* at 167. The victim did not testify that she and the defendant had *sexual* intercourse, nor did she testify about the extent of any penetration. *Id.* at 167–68. The Ohio Supreme Court held that the evidence was insufficient to sustain a rape conviction, noting that sexual intercourse was only one of the accepted definitions of the word "intercourse." *Id.* The court reasoned that "we will not draw inferences against the accused from what must be characterized as vague and ambiguous testimony." The court stated that "it is the state's burden to prove an accused's guilt beyond a reasonable doubt, not ours," and while it may be unpleasant for a victim to describe a sexual attack in court, "we must reinforce the need to have the events described with sufficient clarity to establish the offender's guilt beyond a reasonable doubt." *Id.* at 168, fn. 6.

{¶ 128} Here, though, we are not required to draw any inferences against Sanchez to find actionable penetration. J.T. specifically testified that Sanchez touched the "inside" of her "lower" "private part." She testified that she knew what the word "vagina" meant and said that Sanchez touched the inside of her vagina. As discussed above, even if this testimony were ambiguous about whether Sanchez physically penetrated J.T.'s vagina (as opposed to her labia), J.T. was able to differentiate between the "outside" and the "inside" of her genitals and she specifically said Sanchez touched the "inside." If believed, this testimony would be sufficient to support a conclusion that Sanchez penetrated J.T.'s vagina as that word is used in the statute.

{¶ 129} The state presented evidence that J.T. was less than 13 years old at the time of the sexual conduct.

{¶ 130} J.T. also testified that Sanchez compelled the sexual conduct by force. Among other things, J.T. testified that Sanchez pushed her into the bathroom, turned her around, took off her clothes, penetrated her and then threatened to kill her parents if she disclosed the encounter. She testified that during the assault, she tried to block herself from Sanchez's touch and push him away but he overcame her efforts and persisted in touching her.

{¶ 131} There was, therefore, sufficient evidence for the jury to find that Sanchez raped J.T. while she was less than 13 years old and purposely compelled the sexual conduct through force or threat of force.

{¶ 132} We overrule Sanchez's first assignment of error as it relates to his conviction for rape.

### 2. There was Sufficient Evidence to Support the Gross-Sexual-Imposition Conviction

{¶ 133} Ohio Revised Code Section 2907.05 states, in relevant part, that a person commits gross sexual imposition by "hav[ing] sexual contact with another * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4).

{¶ 134} "Sexual contact" means, in relevant part, "any touching of an erogenous zone of another, including * * * if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 135} We readily find sufficient evidence here. J.T. testified that when she was less than 13 years old, Sanchez pushed her into a bathroom, took off her clothes and "grabb[ed]" her breasts under her shirt and bra. A rational trier of fact could find that Sanchez did this for his own sexual arousal and gratification.

{¶ 136} We overrule Sanchez's first assignment of error as it relates to his conviction for gross sexual imposition.

### 3. There was Insufficient Evidence to Support the Conviction for Illegal Use of a Minor in Nudity-Oriented Material or Performance

{¶ 137} In most circumstances, it is illegal for a person to "create, direct, produce, or transfer any material or performance that shows [a] minor * * * in a state of nudity."[5] R.C. 2907.323(A)(1). In relevant part, "nudity" includes "the showing, representation, or depiction of human * * * female genitals, pubic area, or buttocks with less than a full, opaque covering, or of a female breast with less than a full, opaque covering of any portion thereof below the top of the nipple * * *." R.C. 2907.01(H).

{¶ 138} Sanchez's argument on appeal[6] is focused on whether there was sufficient evidence that the photographs J.T. allegedly took of herself and sent to

---

[5] There are enumerated circumstances in which it is not illegal to do so, R.C. 2907.323(A)(1)(a)–(b), but these circumstances are not relevant here.

[6] The state's and Sanchez's Crim.R. 29 arguments at trial focused on whether Sanchez's solicitation of "naked photographs" could be considered "creat[ing], direct[ing], produc[ing], or transfer[ring]" nudity-oriented material. Sanchez's trial counsel argued that even if Sanchez received a photograph of J.T. nude, "[r]eceiving is not the same thing as creating, directing or producing or transferring material." The state argued that J.T. created the "nude photos" at Sanchez's direct request and Sanchez's solicitation should

Sanchez were "nudity-oriented material." Sanchez argues that J.T.'s testimony was the only evidence presented about the contents of the photographs she allegedly sent to him and she did not testify that those photographs showed her genitals, pubic area, buttocks or breasts below the top of the nipple. Sanchez says that the state's evidence is not sufficient to sustain a conviction for illegal use of a minor in nudity-oriented material or performance. We agree.

{¶ 139} On direct examination, J.T. testified that after the assault in the bathroom, Sanchez asked her to send him pictures of herself. She said that at first, he asked for "normal pictures" like "selfies." She said she did send him "selfies." The state introduced one such photograph, which J.T. identified as depicting her and her cousin. J.T. said that he would also send her messages saying that she was pretty and "[w]hy don't I go sleep with him a day."

{¶ 140} J.T. testified that Sanchez then began asking her for "naked pictures." She said that she initially declined, but Sanchez insisted, telling her that he would erase the photographs "and nothing will happen."

{¶ 141} J.T. continued testifying as follows about the "nude photos" she sent to Sanchez:

---

therefore be considered "direct[ing]" nudity-oriented material. Because we find that there was insufficient evidence as to the "nudity-oriented material" element, we need not determine on this appeal whether a defendant who merely solicits and receives a nude photograph of a minor — without otherwise facilitating the creation of the photograph or transferring the photograph — can be considered to have "created, directed, produced, or transferred" the photograph.

[PROSECUTOR]: [J.T.], at any point in time, did you take any nude photos of yourself?

[J.T.]: Yes.

* * *

[PROSECUTOR]: I know this is difficult and probably a little awkward. Can you describe the photos that you took of yourself?

[J.T.]: I have — just like on my phone, I would take pictures. I don't remember if I used the mirror, but I think I did.

[PROSECUTOR]: Okay.

[J.T.]: I just took the pictures and just sent it.

[PROSECUTOR]: Were you wearing any clothes at all in those photos?

[J.T.]: No.

[PROSECUTOR]: You were completely naked?

[J.T.]: Yes.

[PROSECUTOR]: No underwear?

[J.T.]: No.

[PROSECUTOR]: No bra?

[J.T.]: No.

[PROSECUTOR]: No shirt?

[J.T.]: No.

[PROSECUTOR]: Was your face visible in those photos?

[J.T.]: I think.

{¶ 142} The state did not introduce any of the alleged nude photographs into evidence, nor did the state introduce any of Sanchez's alleged requests for "naked pictures." J.T. testified that she deleted Sanchez's requests and the nude

photographs from her phone. No one else testified about what those photographs depicted and, therefore, J.T.'s testimony is the sole source of direct evidence about what those photographs depicted.

{¶ 143} We find that J.T.'s testimony is vague and ambiguous as to what the photographs actually depicted, beyond J.T.'s face. She testified that she was "completely naked" when she took the photographs but her testimony could describe photographs that are not nudity-oriented material. For example, this testimony could describe photographs of just J.T.'s face; photographs of J.T.'s face and bare shoulders; photographs of J.T.'s face, shoulders and breasts only above the top of the nipples or photographs of J.T.'s back from the waist up, with J.T. looking backwards over her shoulder into the mirror. The testimony could describe photographs where electronic stickers or some other electronic filter covers the body parts that would otherwise trigger criminal liability. Even if J.T. were completely naked when she took the photographs, if the photographs did not depict one or more enumerated body parts, they were not nudity-oriented material. *See* R.C. 2907.01(H).

{¶ 144} Thus, to sustain Sanchez's conviction, we would have to "draw inferences against the accused from what must be characterized as vague and ambiguous testimony." *Ferguson*, 5 Ohio St.3d at 167–168, 450 N.E.2d 265.

{¶ 145} The state argues that a reasonable factfinder could draw the necessary inference from the circumstantial evidence presented. Sanchez solicited "naked pictures" from J.T. after he assaulted her. When she said no, he insisted,

promising her that he would delete them "and nothing will happen." J.T. purportedly deleted the photographs that were sent. Sanchez sent J.T. a photograph of his lap, in which he was wearing only underwear.

{¶ 146} J.T. and Mother both testified that Mother made it clear to J.T. and Sanchez that they were not allowed to communicate with each other. Mother told Sanchez that if she caught him texting J.T. again, she would go to the police. Sanchez and J.T. were thus already motivated to hide their communications. On the record before us, we cannot say that deleting the photographs is an indication that the photographs were nudity-oriented material. In fact, a reasonable factfinder may have drawn the *opposite* inference from the circumstantial evidence about the photographs' content. J.T. may have been more likely to leave her pubic area, breasts below the top of the nipples and buttocks out of the photographs because she was hesitant to send naked pictures to Sanchez in the first place.

{¶ 147} The state refers us to *State v. Sotelo* in support of its argument. *Sotelo*, 6th Dist. Lucas No. L-19-1240, 2020-Ohio-5368. The nature of the videos in that case, though, was not in dispute; the defendant conceded that the videos were child pornography. *Id.* at ¶ 52. The issue in *Sotelo* was whether the evidence was sufficient to establish that the defendant *knew* that the videos were child pornography when she disseminated them. *Id.* The appeals court reasoned that there was sufficient evidence that she did know, because she admitted that she saw a thumbnail image of a child, a forensic examination revealed that she had deleted

the videos and she sent a text message acknowledging that she had sent an illicit image of a "preteen." *Id.*

{¶ 148} Here, Sanchez has not conceded that any of the photographs J.T. sent him were nudity-oriented material and the only evidence presented about these photographs was that J.T. was naked when she took them and she thinks they showed her face. After a careful review of the record, we find that there is insufficient evidence for a reasonable factfinder to conclude beyond a reasonable doubt that the photos were "nudity-oriented material."

{¶ 149} The state has elicited sufficiently detailed testimony in other cases where the photographs at issue were not introduced into evidence. In *State v. Murphy*, for example, the state did not admit the photograph at issue into evidence but it elicited the following testimony from the victim-witness at trial:

Q: Did [Defendant] ever take a photograph of you, [M.A.]?

A: Yes, he did.

Q: Would you tell the jury about that?

A: One night [Defendant] walked into my bedroom, and he had a camera with him, and he undressed me, and laid me on the bed with my arms and legs spread, and he told me to stay still, and he took about three or four pictures.

Q: What type of camera was this?

A: I'm pretty sure it was a Polaroid because the pictures came right out.

Q: You said that — did he take your clothes off?

A: Yes, he did.

Q: And so you had no clothes on?

* * *

A: Yes.

Q: And how did he ask you to place yourself on the bed?

A: He placed me. I didn't move, I was too scared to move.

Q: So what did he do? How did he lay you out?

A: My arms and legs were spread.

Q: Okay. So — I have to ask you this[:] * * * your vagina could be seen?

A: Yes.

* * *

Q: And did the camera, did it have a flash on it or no flash?

A: It had a flash on it.

Q: And what did he do after he took the photographs?

A: He put the photos in his pocket, his shirt pocket, and he left my room, and I got dressed.

*State v. Murphy*, 9th Dist. Summit No. 23467, 2007-Ohio-4532, ¶ 14.

{¶ 150} The state bears the burden of proof and we find that this is a situation where we "must reinforce the need to have the events described with sufficient clarity to establish the offender's guilt beyond a reasonable doubt." *Ferguson*, 5 Ohio St.3d at 168, 450 N.E.2d 265, fn. 6.

{¶ 151} Viewing the evidence in the state's favor, as we must, there was insufficient evidence presented to sustain a conviction for illegal use of a minor in

nudity-oriented material.[7]   Therefore, the trial court erred by denying Sanchez's motion for acquittal on that count

{¶ 152} We sustain Sanchez's first assignment of error as it relates to his conviction for illegal use of a minor in nudity-oriented material.

**B. Second Assignment of Error — Manifest Weight of the Evidence**

{¶ 153} Sanchez contends that his convictions were against the manifest weight of the evidence.

{¶ 154} A manifest-weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion at trial. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26 (citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13.

{¶ 155} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree "'with the factfinder's resolution of the conflicting testimony.'" *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).  The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility

---

[7] The state does not argue that Sanchez could be convicted of illegal use of a minor for soliciting a nude photograph from J.T., even if J.T. sent him photographs that did not depict nudity as that term is defined in the statute.  We are aware of at least one case in which a defendant was convicted of *attempted* illegal use of a minor in nudity-oriented material for soliciting a photograph of a minor's erect penis, when no such photograph was actually sent.  *State v. Dellifield*, 3d Dist. Hardin No. 6-18-06, 2018-Ohio-4919.  But Sanchez was not charged with or convicted of a criminal attempt.

and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). In conducting this review, this court remains mindful that the credibility of witnesses and the weight of the evidence are matters primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraphs one and two of the syllabus. Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weights heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 156} Sanchez contends that there was no evidence presented at trial corroborating J.T.'s allegations about the assault in the bathroom. Sanchez points out that there was no physical evidence and that the police did not collect J.T.'s clothing or visit the crime scene. He further points out that the forensic review of J.T.'s cell phone revealed nothing of evidentiary value. He directs us to Mother's testimony that she saw nothing out of the ordinary on the day that J.T. was with Sanchez and Father's testimony that he did not notice any behavioral changes in J.T. following the alleged incident.

{¶ 157} After identifying what he sees as the weaknesses in the state's case, Sanchez contends that the defense theory of the case was well supported by the evidence. Specifically, Sanchez argues that J.T. fabricated the assault in the bathroom to avoid her parents' disappointment and mitigate discipline after she was

caught — for a third time — continuing an inappropriate texting relationship with an older man whom she believed she loved. Sanchez points out that J.T. adamantly denied that her parents spanked her when both her Mother and Father testified that they did spank her. We also note that J.T. admitted that she did not like disappointing her parents or getting in trouble and knew that her texting relationship with Sanchez was wrong and went against her parents' clear instructions. She also admitted that she did not tell her parents about the alleged assault until after her parents caught her for the third time and had already gotten the police involved in the case. Sanchez contends that J.T. had strong motivation to lie when she described the assault for the first time.

{¶ 158} In reviewing the record, there are some inconsistencies in the state's case and in the witnesses' testimony. The timeline of events is not exactly clear or completely consistent between the state's witnesses. J.T. testified that Mother sent one of the text messages in the state's exhibits but Mother denied sending the message. The descriptions of the several confrontations about the continuing text messages were not completely consistent between J.T., Mother and Father. The detective testified that J.T. initially reported that Sanchez kissed her during the assault but J.T. testified that he did not kiss her. The detective further testified that J.T. initially reported that the assault stopped when Sanchez's daughter came back into the house but J.T. testified that the assault stopped when her phone rang. Father testified that he recently suffered a bad accident and cannot remember things well. He further admitted that he continued texting with Sanchez even after J.T.

alleged that Sanchez raped her, testifying that "even though I knew what had happened, I never really thought that [Sanchez] was capable of doing something like that. I thought of him as my friend still. I never really believed that he would be able to do something like that." When defense counsel asked him whether he believed J.T. as of December 2019, after all the allegations had come out, Father's response was "I don't know what to tell you."

{¶ 159} In looking at the record as a whole, though, we cannot say that Sanchez's rape or gross sexual imposition convictions were against the manifest weight of the evidence. A defendant is not entitled to reversal merely because certain aspects of witness testimony are inconsistent or contradictory. *E.g.*, *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38 ("'A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'"), quoting *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render [a] defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95AP09-1236, 1996 Ohio App. LEXIS 2245 (May 28, 1996).

{¶ 160} J.T.'s testimony was materially consistent with respect to Sanchez pushing her into the bathroom, inserting his finger into her vagina and groping her breasts. J.T. testified that she did not immediately report the assault because she

was afraid of Sanchez and because she felt that she was in love with him. "There is no requirement that a rape victim's testimony be corroborated as a condition precedent to conviction." *See State v. Daniels*, 8th Dist. Cuyahoga No. 92563, 2010-Ohio-899, ¶ 59.

{¶ 161} Sanchez argued his case to the jury, highlighting the inconsistencies he saw in the state's case and argued that J.T. was motivated to lie about the assault. The jury was free to reject any portion of the state's evidence or J.T.'s testimony that was inconsistent or otherwise unbelievable. The jury chose to believe her.

{¶ 162} After a thorough review of the record, and after considering Sanchez's appellate arguments, we cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice such that a conviction must be reversed. We, therefore, overrule Sanchez's second assignment of error.

## C. Third Assignment of Error — Judicial Bias

{¶ 163} Sanchez contends that the trial court's treatment of juror No. 18 during jury selection was spiteful and arbitrary. He says the trial court's removal of juror No. 18 assisted the state by giving it a *de facto* extra peremptory challenge and is evidence that the trial court was biased against Sanchez. Sanchez says the trial court thus committed structural error, in violation of the Due Process Clause of the United States Constitution.

{¶ 164} "A structural error is a violation of the basic constitutional guarantees that define the framework of a criminal trial * * *." *State v. West*, Slip

Opinion No. 2022-Ohio-1556, ¶ 2. A structural error cannot be harmless and is grounds for automatic reversal where a party raised an objection to the error in the trial court. *See id.* The defense objected to juror No. 18's removal for cause during voir dire.

{¶ 165} "[A] criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34; *see also State v. Sanders*, 92 Ohio St.3d 245, 2001-Ohio-189, 750 N.E.2d 90 ("The presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error, which if shown requires reversal without resort to harmless-error analysis."). "The term 'biased' 'implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.'" *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 73, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus.

{¶ 166} Trial judges routinely encounter prospective jurors who do not see the value of serving on a jury, are distracted by pressing concerns in their lives when they are called to serve, or otherwise express that they do not want to serve on a jury. A trial court has wide discretion over the manner in which voir dire is accomplished — *see, e.g.*, *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880

N.E.2d 31, ¶ 54 — and experienced judges will develop their own practices to address these situations.

{¶ 167} While we do not endorse the trial court's treatment of juror No. 18, we readily conclude that there was no manifestation of judicial bias against Sanchez and we find no basis here to reverse the matter for a new trial.[8] We "presume that a judge is unbiased and unprejudiced in the matters over which [the judge] presides, and 'the appearance of bias or prejudice must be compelling in order to overcome the presumption.'" *Cleveland v. Goodman*, 8th Dist. Cuyahoga Nos. 108120 and 108678, 2020-Ohio-2713, ¶ 18, quoting *State v. Eaddie*, 8th Dist. Cuyahoga No. 106019, 2018-Ohio-961, ¶ 18. There is no compelling appearance of bias or prejudice here. The trial court's reasoning for removing juror No. 18 was that the court did not view juror No. 18's answers during voir dire to be honest. Sanchez points to no other judicial conduct throughout the course of the trial that he contends shows bias against the defense.

{¶ 168} We conclude that the trial court's removal of juror No. 18 does not indicate that the court harbored a "hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney."

---

[8] Sanchez does not claim that the removal of juror No. 18 warrants reversal even in the absence of judicial bias. We nevertheless note that the Ohio Supreme Court has held that "an erroneous excusal for cause, on grounds other than the [prospective juror's] views on capital punishment, is not cognizable error, since a party has no right to have any particular person sit on the jury." *Sanders* at 249. Thus, even if the trial court erred in dismissing juror No. 18 for cause when she and her fellow jurors denied that anyone was making concerning statements during voir dire, "an erroneous excusal cannot cause the seating of a biased juror and therefore does not taint the jury's impartiality." *Id.*

{¶ 169} We, therefore, overrule Sanchez's third assignment of error.

**D. Fourth Assignment of Error – Flight Instruction**

{¶ 170} The trial court gave the following jury instruction over the defense's objection:

> Testimony has been admitted indicating that the Defendant fled the scene. You're instructed that the Defendant's flight alone does not raise a presumption of guilt. But it may tend to indicate the Defendant[']s consciousness or awareness of guilt.
>
> If you find that the facts do not support that [so in original transcript] the Defendant[']s flight or if you find that some other motive prompted the Defendant's conduct or if you're unable to decide what the Defendant[']s motivation was, then you should not consider the evidence for any purpose.
>
> However, if you find that the facts support that the Defendant engaged in such conduct and if you decide that the Defendant was motivated by a consciousness or an awareness of guilt, you may, but are not required, to consider that evidence in deciding whether the Defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to the evidence.

{¶ 171} Sanchez contends that the trial court erred in giving this instruction because "there was no evidence that Mr. Sanchez attempted to evade prosecution."

{¶ 172} We review the trial court's instruction for an abuse of discretion. *E.g.*, *State v. Howard*, 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176, ¶ 35.

{¶ 173} As a general matter, a trial court must "'fully and completely give all jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the trier of fact.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus; *State v. Joy*, 74 Ohio St.3d 178,

181, 657 N.E.2d 503 (1995). A requested jury instruction should ordinarily be given — at least in substance — if it is a correct statement of the law, applicable to the facts of the case and if reasonable minds might reach the conclusion sought by the requested instruction. *E.g.*, *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240; *State v. Crawford*, 2016-Ohio-7779, 73 N.E.3d 1110, ¶ 14 (8th Dist.).

{¶ 174} Sanchez does not contend that the court's flight instruction misstated the law. The instruction largely mirrors the pattern jury instruction on consciousness of guilt in the Ohio Jury Instructions. *See* 2 OJI CR 409.13.[9] Sanchez instead argues that the instruction is inapplicable to the facts of the case and that there was insufficient evidence to support the instruction. We agree.

---

[9] The pattern jury instruction reads as follows:

Testimony has been admitted indicating that the defendant (fled the [scene] [*describe jurisdiction*]) (escaped from custody) (resisted arrest) (falsified his/her identity) (changed appearance) (intimidated a witness) (attempted to conceal a crime) (*describe other conduct*). You are instructed that (*describe defendant's conduct*) alone does not raise a presumption of guilt, but it may tend to indicate the defendant's (consciousness) (awareness) of guilt. If you find that the facts do not support that the defendant (*describe defendant's conduct*), or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by (a consciousness) (an awareness) of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crime(s) charged. You alone will determine what weight, if any, to give to this evidence.

2 OJI CR 409.13.

{¶ 175} As a preliminary matter, we are mindful that erroneous flight instructions have been a particular concern in this district in recent years. As we have stated previously:

> The frequency with which flight instructions issues are being raised on appeal is troubling. Although a number of recent decisions from this court have made it clear that the flight instruction is often being wrongly given, the state keeps requesting it in cases where the instruction is unwarranted. And even though the instructions are requested by prosecuting attorneys, the error lies with the trial court continuing to give the flight instruction without regard to our established precedent.

*State v. Hartman*, 8th Dist. Cuyahoga No. 105159, 2018-Ohio-2641, ¶ 50.

{¶ 176} Here, we find two errors with the instruction the trial court gave. First, there was insufficient evidence to support the inference that the instruction allows. Second, the instruction as given does not accurately apply to the facts at issue in the case.

{¶ 177} Flight from justice "may be indicative of a consciousness of guilt." *State v. Taylor*, 78 Ohio St.3d 15, 27, 676 N.E.2d 82 (1997).[10] "Flight from justice means some escape or affirmative attempt to avoid apprehension." *State v. Wesley*, 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429, ¶ 19. Flight is more than merely

---

[10] The U.S. Court of Appeals for the Sixth Circuit has described that flight evidence is admissible under an inferential chain "'(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.'"). *United States v. Suggs*, 822 Fed. Appx. 422 (6th Cir.2020), quoting *United States v. Dillon*, 870 F.2d 1125, 1127 (5th Cir.1989). In federal courts in the Sixth Circuit, "a flight instruction is improper unless the evidence is sufficient to furnish reasonable support for all four of the necessary inferences." *United States v. Wilson*, 385 Fed. Appx. 497, 501 (6th Cir.2010).

leaving the scene of the crime — it would be unrealistic to expect persons who commit crimes to remain on the scene for ready apprehension. *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30. Flight in this context requires the defendant to appreciate that he has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found. *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 28. The trier of fact may infer that such circumstances show that the defendant is avoiding the police only because he knows that he is guilty and wishes to avoid the inevitable consequences of his crime. *Id.*

{¶ 178} The evidence presented at trial was that Sanchez left Ohio for New York approximately one month after seeing Mother and Father at the office of immigration authorities. Law enforcement attempted to execute an arrest warrant at what they believed was Sanchez's home and while officers believed that there were people inside the house, no one answered the door. Father came to learn of Sanchez's location in New York after offering a reward for his location. Law enforcement agents located, and arrested, Sanchez in New York. Sanchez did not resist arrest and waived extradition.

{¶ 179} These circumstances do not clearly show that Sanchez appreciated that he had been identified as a person of interest in a criminal offense and was taking active measures to avoid arrest.

{¶ 180} As an initial matter, Sanchez did not leave for New York until months after the alleged assault in the bathroom. Father testified that Sanchez stayed in

Ohio for a month even after seeing Mother and Father at the immigration office. While the "admissibility of evidence of flight does not depend upon how much time passes between the offense and the defendant's flight" — *State v. Hand*, 107 Ohio St.3d 378, 402, 2006-Ohio-18, 40 N.E.2d 151 — evidence of flight to support an inference of guilt "'should *generally* be limited to situations when the activities associated with flight occur at a time and place near the criminal activity for which the defendant is on trial.'" (Emphasis added.) *State v. Robinson*, 10th Dist. Franklin No. 17AP-853, 2019-Ohio-558, ¶ 31, quoting *State v. White*, 2d Dist. Montgomery No. 26093, 2015-Ohio-3512, ¶ 48, 37 N.E.3d 1271; *see also State v. Martin*, 10th Dist. Franklin Nos. 96APA04-450 and 96APA04-459, 1996 Ohio App. LEXIS 5851, 30–31 (flight evidence admissible where defendant left the state immediately after the crime had been committed); *State v. Jackson*, 9th Dist. Lorain No. 11CA010012, 2012-Ohio-3524, ¶ 17–18 (flight instruction warranted where the defendant left the state shortly after the crime was committed); *State v. Pryor*, 5th Dist. Stark No. 2017CA00122, 2018-Ohio-2712, ¶ 46–47 (same); *State v. Villa*, 9th Dist. Lorain No. 05CA008773, 2006-Ohio-4529, ¶ 28–31 (flight instruction warranted where law enforcement sought the defendant for questioning within a day of the crime being committed and could not find him in the county, and where the defendant was arrested in another state several weeks later).

{¶ 181} There is also no evidence that Sanchez took any steps to conceal where he was going or to conceal himself once he was in New York. *Compare Pryor* at ¶ 46–47 (defendant lied to his girlfriend about where he was going and why he

was leaving); *State v. McCarty*, 5th Dist. Stark No. 2014CA00142, 2015-Ohio-1440, ¶ 36–38 (instruction appropriate where the defendant's mother said the defendant knew about the criminal investigation and left the state after telling the mother he was going out with friends); *Martin* at 30–31 (defendant changed his appearance and lived under an assumed name after he left the state).

{¶ 182} Finally, the detective testified that Sanchez did not resist arrest when apprehended by law enforcement agents in New York and waived extradition back to Ohio for prosecution. *See State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, ¶ 48 (flight instruction erroneous where, among other things, defendant did not flee from, resist or protest his arrest in any way when police apprehended him).

{¶ 183} At best, there is evidence that Sanchez *might have* known that law enforcement was seeking him in connection with a criminal investigation involving J.T. when he left for New York. The detective testified that officers went to what they *believed* was his home to arrest him and for some reason thought that someone was home at the time but this was never confirmed through entry into the premises. But what is not clear is whether Sanchez knew he was wanted by the police. The state did not elicit any testimony substantiating that police went to Sanchez's home or that there was anyone, let alone Sanchez, at the house when police arrived.

{¶ 184} Viewing the evidence as a whole, we cannot say that it is "clear the defendant took affirmative steps to avoid detection and apprehension." *State v. Gulley*, 8th Dist. Cuyahoga No. 109045, 2020-Ohio-3597, ¶ 26. Therefore, it was

error for the trial court to instruct the jury on flight as consciousness of Sanchez's guilt.

{¶ 185} Even if there had been sufficient evidence to support a flight instruction, the trial court's instruction did not apply to the evidence the state presented. The trial court instructed the jury that "[t]estimony has been admitted indicating that the Defendant *fled the scene*." (Emphasis added). At oral argument, the state defended this characterization of the evidence by pointing out that there were several "scenes" that the jury could have reasonably found that Sanchez fled, including J.T.'s home, the bathroom where she said the assault occurred and the locations where J.T. took the photographs of herself to send to Sanchez. But again, merely leaving the scene of a crime is not flight from justice. *E.g.*, *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30.

{¶ 186} "Fled the scene" is the first of many options provided in the pattern jury instruction on flight in the Ohio Jury Instructions. "While OJI is widely used in this state, its language should not be blindly applied in all cases." *State v. Burchfield*, 66 Ohio St.3d 261, 263, 611 N.E.2d 819 (1993). If a trial court is going to use the pattern jury instruction, it still must tailor the instruction to accurately apply to the evidence presented. The trial court did not do so here.

{¶ 187} Having concluded that the trial court erroneously instructed the jury on flight as consciousness of guilt, we must now determine whether the error requires reversal for a new trial. "'A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions

constituted prejudicial error.'" *Jackson*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, at ¶ 46, quoting *State v. McKibbon*, 1st Dist. Hamilton No. C-010145, 2002-Ohio-2041, ¶ 4. To determine whether an erroneous instruction was prejudicial, a reviewing court must examine the jury instructions as a whole. *State v. Shepherd*, 8th Dist. Cuyahoga No. 102951, 2016-Ohio-931, ¶ 25, citing *State v. Harry*, 12th Dist. Butler No. CA2008-01-013, 2008-Ohio-6380, ¶ 36. A jury instruction constitutes prejudicial error where it results in a manifest miscarriage of justice. *State v. Hancock*, 12th Dist. Warren No. CA2007-03-042, 2008-Ohio-5419, ¶ 13. Conversely, though, errors, defects, irregularities or variances that do not affect substantial rights are to be disregarded. Crim.R. 52(A).

{¶ 188} After reviewing the jury instructions as a whole, we cannot say that the trial court's instruction on flight resulted in a manifest miscarriage of justice. The instruction given, although improper, allowed the jury to make its own conclusion regarding whether Sanchez fled from law enforcement and to consider his motivations for doing so. The instruction correctly advised that if the jury concluded that Sanchez fled, it should not consider evidence of that flight unless it also found that the flight was motivated by a consciousness of guilt. Further, the instruction advised the jury that it may, but is not required to, consider the evidence of flight in deciding whether Sanchez is guilty. *State v. Hill*, 8th Dist. Cuyahoga No. 99186, 2013-Ohio-3245, ¶ 31; *see also State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 106 (commenting that a flight instruction "is all but innocuous" because "'[t]he flight instruction explains the limited use of the flight

evidence and clearly says that the jury may consider the defendant's flight only if it finds that he was 'motivated by a consciousness or awareness of guilt.' And even if the jury finds that this motivated him, the instruction says that it is still not required to consider the flight evidence.'"), quoting *White*, 2015-Ohio-3512, 37 N.E.3d 1271, at ¶ 51.

{¶ 189} The defense did not object to the introduction of testimony establishing the fact that Sanchez left Ohio for New York sometime after J.T.'s family reported the assault to police. Both parties argued their views of that evidence to the jury in their closing arguments. The defense argued that Sanchez went to New York because he was in fear of being deported as he was in the country without legal status with his seven-year-old daughter. The defense pointed out that Sanchez did not resist arrest or fight extradition. The state argued that Sanchez fled Ohio for New York because he knew J.T. had finally disclosed the sexual assault to the police.

{¶ 190} Accordingly, while the trial court abused its discretion in issuing the flight instruction, we find the instruction was harmless beyond a reasonable doubt.

{¶ 191} We, therefore, overrule Sanchez's fourth assignment of error.

### E. Fifth Assignment of Error — Ineffective Assistance of Counsel

{¶ 192} Sanchez contends that his trial counsel was ineffective because (1) counsel told the jury several times that Sanchez was in the United States "illegally," and (2) counsel failed to object to or attempt to remedy the detective's testimony that Father offered people in New York reward money for Sanchez's location.

{¶ 193} A criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Id.*

{¶ 194} In evaluating counsel's performance on a claim of ineffective assistance of counsel, the court must give great deference to counsel's performance and "indulge a strong presumption" that counsel's performance "falls within the wide range of reasonable professional assistance." *Strickland* at 689; *see also State v. Powell*, 2019-Ohio-4345, 134 N.E.3d 1270, ¶ 69 (8th Dist.) ("'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"), quoting *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

{¶ 195} As a general matter, defense counsel's tactical decisions and trial strategies — even "debatable" ones — do not constitute ineffective assistance of counsel. *See, e.g., State v. Black*, 8th Dist. Cuyahoga No. 108001, 2019-Ohio-4977, ¶ 35; *State v. Foster*, 8th Dist. Cuyahoga No. 93391, 2010-Ohio-3186, ¶ 23; *see also State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101, 111. Reviewing courts "will ordinarily refrain from second-guessing strategic decisions counsel make at trial," even where trial counsel's strategy was "questionable" and even where appellate counsel argues that they would have defended against the

charges differently. *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 152; *State v. Mason*, 82 Ohio St.3d 144, 169, 694 N.E.2d 932 (1998); *State v. Quinones*, 8th Dist. Cuyahoga No. 100928, 2014-Ohio-5544, ¶ 25.

{¶ 196} Here, trial counsel's decision to raise the issue of Sanchez's lack of legal immigration status was clearly part of the defense strategy. Sanchez's defense was focused on challenging the credibility of the state's witnesses, highlighting the lack of corroborating physical evidence and arguing that the matter was poorly investigated. In attacking the credibility of the state's witnesses, the defense argued that J.T. had motivations to lie and that Mother and Father were trying to get Sanchez deported from the country. The fact that Sanchez was in the country without legal status was part of that argument.

{¶ 197} Defense counsel may also have anticipated that Sanchez's immigration status would come out in the prosecution's case in chief to explain why Mother and Father made their initial report to immigration authorities and may have wanted that information to be provided by the defense.

{¶ 198} Defense counsel was concerned that members of the venire may harbor biases that would cause them to infer guilt from Sanchez's immigration status, based upon his voir dire and by addressing Sanchez's status in voir dire, counsel was potentially able to identify any such bias.

{¶ 199} Finally, defense counsel offered Sanchez's fear of deportation to explain why Sanchez left Ohio for New York. Sanchez's immigration status was clearly relevant to that argument.

{¶ 200} Sanchez argues on appeal that it was "completely unnecessary" for defense counsel to raise Sanchez's immigration status at trial but we will not second-guess trial counsel's strategy. *Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, at ¶ 152.

{¶ 201} Sanchez also contends that trial counsel was ineffective because counsel failed to object to the detective's testimony that Father offered reward money for Sanchez's location.

{¶ 202} "Objecting is a tactical decision." *E.g.*, *State v. Frierson*, 8th Dist. Cuyahoga No. 105618, 2018-Ohio-391, ¶ 25, citing *State v. Johnson*, 7th Dist. Jefferson No. 16 JE 0002, 2016-Ohio-7937, ¶ 46. Accordingly, "'the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel.'" *E.g.*, *Frierson* at ¶ 25, quoting *Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶ 103.

> "[E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754 (6th Cir.2006).

{¶ 203} Here, Sanchez does not contend that trial counsel consistently failed to use objections throughout the trial. Instead, he argues that (1) the state's case was

so weak that there is a reasonable possibility that the jury's verdict relied on a conclusion that Sanchez fled Ohio to avoid prosecution and (2) the jury's conclusion that Sanchez fled was likely based on the detective's testimony that Father had offered a reward for Sanchez's location.

{¶ 204} Sanchez also argues that the detective's testimony undercut the defense's ability to rely upon Father's courtroom testimony that he stayed in touch with Sanchez because he did not believe that Sanchez was capable of an assault like J.T. described. Sanchez argues that this testimony was important to the defense and was undercut significantly by the detective's testimony that Father had offered a reward for Sanchez's whereabouts.

{¶ 205} After a careful review of the record, we cannot say that the detective's testimony about the reward offer was "'so prejudicial * * * that failure to object essentially default[ed] the case to the state.'" *See Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, at ¶ 140, quoting *Lundgren*, 440 F.3d 754. As discussed further below, beyond the one reference to the reward offer in the detective's direct examination, neither party referred to the offer again during the trial — including during closing argument. The defense was able to, and did, make effective use of Father's testimony in its closing argument.

{¶ 206} We, therefore, overrule Sanchez's fifth assignment of error.

**F. Sixth Assignment of Error — Hearsay and Confrontation Clause**

{¶ 207} Sanchez contends that the trial court erred in admitting Detective Tusing's testimony that Father "had talked to people that he knew in New York and

offered a reward for his location." Sanchez says that this statement was inadmissible hearsay and he further argues that allowing the testimony violated his Confrontation Clause rights.

{¶ 208} Because Sanchez's trial counsel did not object to this testimony, we review only for plain error. *E.g.*, *State v. Johnson*, 8th Dist. Cuyahoga No. 105424, 2018-Ohio-1387, ¶ 27, citing *State v. Rogers*. 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21–25. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To prevail on a claim of plain error, the defendant must demonstrate that but for the error, the outcome of the proceedings clearly would have been different. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus; *Rogers* at ¶ 22. We have applied the plain error doctrine to instances where the appellant failed to object to an alleged confrontation clause error at trial. *See, e.g.*, *State v. McFeeture*, 2015-Ohio-1814, 36 N.E.3d 689 (8th Dist.)

{¶ 209} The Sixth Amendment to the U.S. Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against [the accused]." The United States Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."

*Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

> 1. For Confrontation Clause purposes, a testimonial statement includes one made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."
>
> 2. In determining whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations.

*State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraphs one and two of the syllabus, quoting *Crawford* at 52.

{¶ 210} Sanchez asserts that the detective's testimony leads to the necessary conclusion that Father told the detective that he had offered the reward money and this was a testimonial statement that should not have been admitted. The state argues that the detective's testimony did not contain a testimonial statement and was offered solely to explain the detective's investigation.

{¶ 211} We need not decide whether the detective's testimony included inadmissible hearsay or a testimonial statement that implicates the Confrontation Clause because, even if allowing this testimony had been an error, it is not clear that the outcome of the proceedings would have been different had the testimony been stricken and, therefore, there is no plain error.

{¶ 212} Beyond the one reference to the reward offer in the detective's direct examination, neither party referred to the reward again during the trial. We note that the state did not refer to the reward in its closing argument or in its rebuttal

argument even after the defense argued to the jury that Father kept in touch with Sanchez after J.T. had made the allegations against Sanchez because Father did not believe his own daughter. The testimony about the reward also did not directly undercut J.T.'s testimony about the assault. After a careful review of the record, we cannot say that the jury's verdict would clearly have been different if the jury had not heard that Father offered reward money to people he knew in New York to discover Sanchez's location.

{¶ 213} We, therefore, overrule Sanchez's sixth assignment of error.

**G. Seventh Assignment of Error — Cumulative Error**

{¶ 214} Sanchez argues that the alleged errors described in his first six assignments of error cumulatively deprived him of his constitutional right to a fair trial.

{¶ 215} Pursuant to the doctrine of cumulative error, a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial-court error does not individually constitute cause for reversal. *State v. Baker*, 8th Dist. Cuyahoga No. 95300, 2011-Ohio-2784, ¶ 59, citing *State v. Garner*, 74 Ohio St.3d 49, 656 N.E.2d 623 (1995).

{¶ 216} In order to find cumulative error present, we first must find that multiple errors were committed at trial. We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Djuric*, 8th Dist. Cuyahoga No. 87745, 2007-

Ohio-413, ¶ 52. To affirm in spite of multiple errors, we would have to determine that the cumulative effect of the errors is harmless beyond a reasonable doubt. *State v. Williams*, 8th Dist. Cuyahoga No. 94261, 2011-Ohio-591, ¶ 25, citing *State v. DeMarco*, 31 Ohio St.3d 191, 195, 509 N.E.2d 1256 (1987) (stating that the errors can be considered harmless if there is overwhelming evidence of guilt or other indicia that the errors did not contribute to the conviction).

{¶ 217} Here, Sanchez merely references the arguments addressed in his first six assignments of error. The error pertaining to the conviction for illegal use of a minor in nudity-oriented material was addressed and sustained in the first assignment of error. As discussed above, we have only found one other error in the trial, that being the trial court's issuance of a flight instruction, which we concluded was harmless. The trial court explained to the jury that each charge is separate and distinct; it instructed the jury to consider each count and the evidence applicable to each count separately. We presume the jury followed that instruction. *E.g.*, *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). Under these circumstances, we find no reason to conclude that the court's erroneous denial of Sanchez's Crim.R. 29 motion as to Count 3 compounded the trial court's erroneous flight instruction to the extent that Sanchez was deprived of the constitutional right to a fair trial as to Counts 1 and 2.

{¶ 218} We, therefore, overrule Sanchez's seventh assignment of error.

## III. Conclusion

{¶ 219} We affirm the judgment of the trial court in part and we vacate it in part.

{¶ 220} Having sustained Elder Sanchez-Sanchez's first assignment of error as it relates to his conviction for illegal use of a minor in nudity-oriented material, we vacate that conviction and remand this matter for the trial court to issue a new journal entry reflecting that this conviction has been vacated for insufficient evidence.[11]

{¶ 221} Having overruled all of Sanchez's assignments of error as it relates to his convictions for rape and gross sexual imposition, we affirm those convictions.

It is ordered that the appellant and the appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR

---

[11] Because we vacated Sanchez's conviction for illegal use of a minor in nudity-oriented material, his other assignments of error as it relates to that conviction are moot. App.R. 12(A)(1)(c).